THE CITY OF HARVARD, Plaintiff-Appellee, v. TODD GAUT,
Defendant-Appellant.

Second District No. 2—94—1458

Opinion filed January 5, 1996.

Charles P. Weech, of Pollock, Meyers, Eicksteadt & Weech, Ltd., of Marengo, for appellant.

David W. McArdle and E. Regan Daniels Shepley, both of Zukowski, Rogers, Flood & McArdle, of Crystal Lake, for appellee.

PRESIDING JUSTICE McLAREN delivered the opinion of the court:

The plaintiff, the City of Harvard (City), has enacted an ordinance which reads, in full:

"26.04 Gang Activity

*It shall be unlawful for any person within the City to wear known gang colors, emblems, or other insignia,* or appear to be engaged in communicating gang-related messages through the use of hand signals or other means of communication." (Emphasis added.) Harvard, Ill., Municipal Code § 26.04 (1993).

The defendant, Todd Gaut, was charged with wearing a gang symbol, a six-pointed star, in violation of the City of Harvard's gang activity ordinance. He moved to dismiss the charges, arguing that the language of the ordinance emphasized above is unconstitutionally vague and overly broad. The trial court denied the motion, convicted the defendant, and sentenced him to supervision. On appeal, the defendant again raises his constitutional challenges to the ordinance.

We reverse the defendant's conviction and hold that the portion of Harvard's gang activity ordinance involved in this case is facially overly broad and violates constitutional guarantees of free speech. Because there is no provision for severing this part of the ordinance from the remainder, the entire ordinance must be invalidated.

On March 8, 1993, the defendant, who was 13 years old at the time, wore a six-pointed star in open view in public. When he saw police officers, he tried to hide the star. The defendant told the officers he belonged to the "Action Packed Gangster Disciples." He also acknowledged that he was not Jewish; he wore the star as a gang symbol and not a religious symbol; and he knew he was violating the ordinance.

On March 8, 1993, the defendant was arrested and charged with violating Harvard's gang activity ordinance. The City of Harvard issued a complaint alleging that the defendant violated the ordinance in that he "unlawfully wore a known gang insignia, that being a six point star on a neck chain, displayed in public view."

In response to the defendant's motion to dismiss, the City observed that the ordinance contains the word "known" and that, in enforcing the ordinance, the Harvard police department construes this language as limiting the reach of the ordinance to a person who actually knows that he or she is wearing gang colors or insignia. The City attached an affidavit of the arresting Harvard police officer, Leslie Lunsmann, to its response to the defendant's motion to dismiss. In the affidavit, Lunsmann states that he is trained and certified in street gang identification and anti-gang education and that the defendant attended a lecture on gang crime he gave at Harvard High School. Lunsmann stated in the affidavit that during the lecture he showed the students a six-pointed star and told them it was a symbol of the Gangster Disciples street gang. He told the students that the gang activity ordinance forbids knowingly wearing gang symbols, colors, or insignia. Further, the City argued that the knowing display of such gang symbols is unprotected by the first amendment (U.S. Const., amend. I) because, insofar as it is communication, it is tantamount to "fighting words."

At the hearing on the defendant's motion to dismiss, the trial court recognized that the defendant maintained that the ordinance is facially unconstitutional; however, the trial court limited the hearing to how the ordinance was enforced in the defendant's case. Despite this limitation, we find that much of the evidence presented at the hearing is relevant to whether the ordinance is facially overly broad. In particular, the hearing sheds light on whether the law is amenable to a narrower construction.

Officer Lunsmann stated during the hearing that he is primarily responsible for instructing the department on the administration of the gang activity ordinance. In this role, the officer defined "street gang" as a group of individuals who are together for malicious, although not necessarily criminal, activity. More specifically, he

explained that most midwestern street gangs are affiliated with either the People Nation or the Folk Nation, which are not "gangs" themselves. Officer Dean Burton, who also testified at the hearing, could not recall the department's exact definition of "gang," but stated that the definition stressed the wearing of distinctive emblems or colors as identification and the customary involvement in criminal activity.

Both officers stated that the department's policy is not to arrest a person for violating the ordinance unless the person previously has been warned. They stated that the main purpose of the ordinance is to discourage gang activity, including attacks by gang members on people who the attackers believe are wearing the colors or symbols of rival gangs. Burton estimated that the department had enforced the ordinance about 100 times; in every case, the arrestees had prior knowledge that they were wearing or using prohibited gang clothing, insignia, or signals. Lunsmann stated that, to his knowledge, the ordinance had not been enforced against anyone who did not have specific prior notice that the clothing or symbols involved were within the gang activity ordinance. In some cases, including the one here, the prior warning was not directed specifically at the offender, but was included in one of the officer's lectures at the City's schools. In Burton's words, the department implemented the prior warning policy because "you can't just arrest somebody that is walking down the street—an average citizen for wearing a—say *** black and gold." Rather, enforcement of the ordinance is to be limited to "gang members and people that are affiliating themselves with gangs. That's what the ordinance is for."

Both officers acknowledged that the six-pointed star is a symbol of Judaism as well as of the gangs affiliated with the Folk Nation. They stated that, if a Jewish person wore a six-pointed star after being warned, the police would arrest that person if they had evidence he was a gang member. Similarly, the officers agreed that walking down the street with one shoelace untied can be a gang symbol and that they would warn a person with untied shoelaces, if they had evidence of gang affiliation, such as wearing known gang colors.

However, both officers acknowledged that "gang colors" and "gang symbols" include a wide and undefined range of clothing and jewelry and that, in most cases, these colors or symbols are not necessarily gang related. According to Officer Lunsmann, the best-known gang "colors" were black and gold (Latin Kings and other People Nation affiliates) and blue and black (Folk Nation affiliates). However, Lunsmann acknowledged that black and gold are also the official colors of Harvard High School. He further acknowledged that blue

and black clothing may be a gang symbol, particularly when displayed via a Duke University baseball cap, which is also a Folk Nation emblem. However, people with no known gang connections wear Duke hats and other blue-black combinations. Moreover, numerous colors may be associated with or used by one gang. Lunsmann agreed with defendant's counsel that "all of the colors under the rainbow can indicate a gang in the right combination" and that "the list is endless." According to the officers, other examples of clothes used as gang symbols include Raiders caps, Bulls jackets and caps, Converse shoes, one untied shoelace, and caps that are tilted to the left or to the right. The officers also conceded that the list of gang symbols or jewelry also includes designs or emblems that are not necessarily gang related. According to Lunsmann, other common gang insignia include the six-pointed star, the "[f]ive-pointed star, backwards Swastika, Playboy bunny head, Spanish cross *** [and] winged heart."

The trial court denied the motion to dismiss and entered a written order, which held that the use of "known" in the ordinance implies that the City must prove the defendant acted with "prior knowledge" and that, under this reasonable construction, the ordinance is sufficiently clear to avoid the danger of arbitrary enforcement. The trial court also found that the City has a legitimate interest in protecting people from organized crime. The trial court acknowledged that, while the ordinance might have been more "artfully drafted," the law is valid as written. Accordingly, the trial court found the defendant guilty of violating the gang activity ordinance and sentenced the defendant to supervision, fines, and costs. The defendant timely appeals.

We agree with the defendant that the gang activity ordinance is unconstitutionally overly broad because it prohibits a substantial amount of constitutionally protected speech. We hold that the ordinance is facially invalid, even with the narrower constructions that the City advances. Also, we reject the City's assertion that the ordinance is a permissible ban on "fighting words."

■ Initially, we note that, generally, a party does not have standing to assert the rights of others not before the court. (*Broadrick v. Oklahoma* (1973), 413 U.S. 601, 610, 37 L. Ed. 2d 830, 839, 93 S. Ct. 2908, 2915.) However, the "overbreadth" doctrine is an exception to the general rule. (*Brockett v. Spokane Arcades, Inc.* (1985), 472 U.S. 491, 503-04, 86 L. Ed. 2d 394, 405-06, 105 S. Ct. 2794, 2801-02.) Because of the potential chilling effect on the protected activities of others, a defendant who is prosecuted for speech or expressive conduct may challenge a law on its face, whether or not his activities are protected

6

by the first amendment. *Broadrick*, 413 U.S. at 610, 37 L. Ed. 2d at 839, 93 S. Ct. at 2915.

Our supreme court stated that "[t]he doctrine of overbreadth is designed to protect first amendment freedom of expression from laws written so broadly that the fear of punishment might discourage people from taking advantage of that freedom." (*People v. Anderson* (1992), 148 Ill. 2d 15, 26.) A law regulating conduct is facially overly broad if it: (1) criminalizes a substantial amount of protected behavior, when judged in relation to the law's "plainly legitimate sweep" (*Broadrick*, 413 U.S. at 615, 37 L. Ed. 2d at 842, 93 S. Ct. at 2917-18); see also *People v. Holder* (1983), 96 Ill. 2d 444, 450); and (2) is not susceptible to a limiting construction that avoids constitutional problems (*Board of Airport Commissioners v. Jews for Jesus, Inc.* (1987), 482 U.S. 569, 574, 96 L. Ed. 2d 500, 507, 107 S. Ct. 2568, 2572). After considering the possible legitimate application of the ordinance, we believe that the ordinance here is substantially overly broad and cannot be rescued by a narrower construction.

The ordinance prohibits gang members from wearing gang colors, emblems, and insignia. However, it also prohibits nongang members from engaging in symbolic speech, which is protected by the first amendment (U.S. Const., amend. I). (*Texas v. Johnson* (1989), 491 U.S. 397, 404, 105 L. Ed. 2d 342, 353, 109 S. Ct. 2533, 2539.) "Speech," as protected in the United States Constitution, includes not only written or spoken words but also a considerable amount of expressive conduct, often called "symbolic speech." (*Johnson*, 491 U.S. at 404, 105 L. Ed. 2d at 353, 109 S. Ct. at 2539; *Spence v. Washington* (1974), 418 U.S. 405, 41 L. Ed. 2d 842, 94 S. Ct. 2727.) Nonverbal conduct implicates the first amendment if the actor intends to convey a particularized message and it is likely the message will be understood by those who view it. *Johnson*, 491 U.S. at 404, 105 L. Ed. 2d at 353, 109 S. Ct. at 2539; *Spence*, 418 U.S. at 410-11, 41 L. Ed. 2d at 846-47, 94 S. Ct. at 2730.

It is well established that wearing certain clothing can be a form of protected symbolic speech. (*Tinker v. Des Moines Independent Community School District* (1969), 393 U.S. 503, 21 L. Ed. 2d 731, 89 S. Ct. 733 (students wearing black armbands to protest U.S. involvement in the Vietnam War engaged in protected symbolic speech); *Cohen v. California* (1971), 403 U.S. 15, 29 L. Ed. 2d 284, 91 S. Ct. 1780 (jacket that carried vulgar anti-draft message is protected symbolic speech); *Dunn v. Carroll* (8th Cir. 1994), 40 F.3d 287, 291-92 (wearing American flag patch as comment on Persian Gulf military buildup is protected symbolic speech).) Since *Tinker*, many decisions have recognized that clothing which identifies the wearer with a particu-

lar organization is a protected form of "speech," even where the organization is morally odious to most people or is known to have a history of routine violence and illegal activity. Thus, courts have ruled that the first amendment protects wearing armbands that signify membership in the American Nazi party (*Collin v. Smith* (7th Cir. 1978), 578 F.2d 1197, 1201) and wearing hoods and robes that promote the Ku Klux Klan or identifying the wearer as a Klan member (*Hernandez v. Superintendent, Fredericksburg-Rappahannock Joint Security Center* (E.D. Va. 1992), 800 F. Supp. 1344, 1351; *Knights of the Ku Klux Klan v. Martin Luther King Jr. Worshippers* (M.D. Tenn. 1990), 735 F. Supp. 745, 751). Even the identifying colors and symbols of the type of street gangs that appear to be the focus of the ordinance here have been accorded first amendment protection. *People ex rel. Gallo v. Acuna* (1995), 39 Cal. App. 4th 184, 200-01, 40 Cal. Rptr. 2d 589, 595-96, *review granted* (1995), 899 P.2d 66, 43 Cal. Rptr. 2d 680 (invalidating an injunction which forbade the wearing of clothing identifying the wearer as a member of one of two named gangs and the use of gestures, symbols, or other communication that described or referred to one of the gangs in question).

■ After review of the ordinance and the record, we determine that the ordinance prohibits constitutionally protected symbolic speech. The record reveals that "gang colors" and "gang clothing" are often worn by nongang members as a form of symbolic speech intended to convey a message unrelated to the promotion of gangs is equally evident. For example, black and gold are the official colors of Harvard High School, and a Bulls jacket is primarily a fashion item for sports fans. One who wears such clothing may well be attempting to convey an easily understood message. But the message is no more likely to be "join a gang" than "Go, Harvard High," or "Be Like Mike."

The record reveals that the Harvard gang activity ordinance is directed at a wide variety of symbolic speech, much of which is not inherently gang related. The subject matter of the law's prohibitions is not merely broad, but open-ended and potentially limitless. The ordinance does not define, list, or explain what constitutes a "gang symbol" or "gang colors"; it does not even define "gang." Further, Officers Lunsmann and Burton conceded that almost any color combination *may* become gang colors and almost any symbol *may* be a gang symbol; in Lunsmann's words, "the list is endless." What is innocent today may become a gang symbol tomorrow *according to the whim of the gangs themselves.* Were a gang (however defined) to adopt red, white, and blue as its colors or the crucifix as a symbol, every school and church would be "flashing" gang signals.

In addition, the ordinance prohibits nongang members from engaging in religious expression. The ordinance prohibits the wearing of religious symbols, which are also known gang symbols. For example, because the six-pointed star is a known gang symbol, it is prohibited by the ordinance. However, the City acknowledges that people also wear the six-pointed star to express their faith or ethnic pride. The six-pointed star is an emblem of Judaism known as the "Star of David." Therefore, the ordinance prohibits the display of the six-pointed star which is protected by the rights of free speech and free exercise of religion under the first amendment. *Chabad-Lubavitch v. Miller* (11th Cir. 1993), 5 F.3d 1383, 1387 (display of menorah is protected symbolic speech).

Because the ordinance prohibits symbolic speech, freedom of religion, and freedom of expression, we conclude that the ordinance is "substantially overbroad." In fact, almost all of its applications are impermissible, even if we adopt the City's suggested narrower constructions.

■ In an attempt to narrow the construction of the ordinance, the City argues that the ordinance restricts only "fighting words," which are by their nature outside the protection of the first amendment. (*Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766.) However, the "fighting words" doctrine is a narrow one, limited to personally abusive epithets which, as a matter of common knowledge, are likely to provoke the average person to retaliation and thereby cause a breach of the peace. (*Johnson*, 491 U.S. at 409, 105 L. Ed. 2d at 357, 109 S. Ct. at 2542; *Cohen*, 403 U.S. at 20, 29 L. Ed. 2d at 291, 91 S. Ct. at 1785.) While it may be possible to imagine a situation in which the display of gang colors or symbols is so inherently personal and inflammatory as to amount to "fighting words" (or "fighting clothes"), a flat prohibition on the display of *any* gang symbols goes well beyond this situation and infringes on substantial amounts of constitutionally protected expression. Moreover, in view of the United States Supreme Court's decision in *R.A.V. v. City of St. Paul, Minnesota* (1992), 505 U.S. 377, 386, 120 L. Ed. 2d 305, 319-20, 112 S. Ct. 2538, 2559, the gang ordinance, as construed by the City, would run afoul of the first amendment even were it limitable to fighting words, for viewpoint-based discrimination, even within this less favored class of speech, is impermissible. *R.A.V.*, 505 U.S. at 386, 120 L. Ed. 2d at 319-20, 112 S. Ct. at 2545.

■ Because the ordinance is unconstitutionally overly broad, we declare the ordinance invalid. The defendant was convicted under one part of the ordinance. However, the ordinance contains no severability clause, and the invalid section is not only important to, but

closely interconnected with, the rest of the ordinance. Therefore, we presume that the City intended all parts of the law to stand or fall together. (See *Williams v. Standard Oil Co.* (1929), 278 U.S. 235, 241-42, 73 L. Ed. 287, 309, 49 S. Ct. 115, 117, *overruled on other grounds*, *Olsen v. Nebraska* (1941), 313 U.S. 236, 85 L. Ed. 1305, 61 S. Ct. 862); *Springfield Armory, Inc. v. City of Columbus* (6th Cir. 1994), 29 F.3d 250, 254; 2 N. Singer, Sutherland on Statutory Construction § 44.09, at 526 (5th ed. 1993).) Nevertheless, it is manifest that, under the first amendment principles we have discussed, the remainder of the ordinance is fatally infirm because it criminalizes the *appearance* of engaging in any gang-related "communication."

By recognizing the unconstitutionality of the Harvard gang activity ordinance, we do not wish to slight or deny the seriousness of the gang problem it addresses. A community has every right to be alert to the spread of organized crime in its midst. However, there are limits to the infringements of our liberties that government may use to combat the evils with which it is properly concerned. In addition, we remind the City that "[i]n attempting to control or prevent activities which are subject to State regulation, the legislature must not use means which sweep too broadly and thereby penetrate the area of protected freedoms." (*People v. Klick* (1977), 66 Ill. 2d 269, 273.) Moreover, the City of Harvard is not helpless to control gang activity. It may punish criminal *conduct* more harshly where the conduct is gang motivated (see *Wisconsin v. Mitchell* (1993), 508 U.S. 476, 124 L. Ed. 2d 436, 113 S. Ct. 2194); prohibit active, intentional, and knowing promotion of criminal gang activity (see *Jackson v. State* (Ind. App. 1994), 634 N.E.2d 532, 536); and prosecute gang "communication" that constitutes disorderly conduct because it rises to the level of fighting words which provoke a breach of the peace (see 720 ILCS 5/26—1(a)(1) (West 1992)). What the City may not do is what it attempted here; that is, enact an ordinance which prohibits substantial amounts of constitutionally protected speech and ignore the mandate from our supreme court to "avoid stifling [such] fundamental personal liberties." *Klick*, 66 Ill. 2d at 273.

Because we hold the ordinance is overly broad, we do not address the defendant's additional argument that the law is unconstitutionally vague.

The judgment of the circuit court of McHenry County is reversed.

Reversed.

GEIGER and THOMAS, JJ., concur.