[No. A094976. First Dist., Div. Two. May 23, 2002.]

STEPHEN GATTO, Plaintiff and Respondent, v.
COUNTY OF SONOMA et al., Defendants and Appellants.

**COUNSEL**

Steven M. Woodside, County Counsel, and Gregory T. Dion, Deputy County Counsel, for Defendants and Appellants.

Law Offices of Joseph J. Wiseman, Joseph J. Wiseman; Law Offices of Harris B. Taback and Harris B. Taback for Plaintiff and Respondent.

**OPINION**

KLINE, P. J.—Respondent Stephen Gatto was ejected from the Sonoma County Fair (Fair) for refusing to remove a vest he was wearing that bore insignia of the Hell's Angels Motorcycle Club. He commenced this litigation against Sonoma County, Sonoma County Fair and Exposition, Inc., which operates the Fair under contract with the county (collectively appellants), and others involved in the running of the Fair, alleging that enforcement of the Fair's dress code policy denied him rights guaranteed under the Unruh Civil Rights Act (Civ. Code, § 51)[1] and article I, section 2 of the California Constitution, which is enforceable through a civil action for damages under section 52.1, subdivision (b).

Determining that Gatto's claims were not time-barred, that he was denied equal access to accommodations in violation of the Unruh Civil Rights Act, and that the dress code was unconstitutional, the trial court denied appellants' motion for judgment on the pleadings and entered judgment awarding Gatto damages and attorney fees.

---

[1] All statutory references are to the Civil Code unless otherwise indicated.

We shall reverse in part and affirm in part. Enforcement of the dress code did not deprive Gatto of full and equal access to accommodations in violation of the Unruh Civil Rights Act. The dress code is, however, void for vagueness and facially overbroad, and its enforcement against Gatto deprived him of a liberty interest in his personal dress and appearance. The trial court therefore correctly found it was unconstitutional and Gatto was entitled to damages and attorney fees.

## FACTS AND PROCEEDINGS BELOW

The facts are simple and undisputed. On August 1, 1998, after Gatto purchased a ticket and entered the Fair, City of Santa Rosa Police Officers Badger and Brazis told Gatto the vest he was wearing, which carried the insignia of the Hell's Angels Motorcycle Club, violated the Fair's dress code and instructed him to either remove the vest or leave the fair. When Gatto refused to take off the vest, the officers ordered him to leave and he complied.

The "Policies and Procedures" promulgated by the Fair set forth rules required to be posted at all admission gates. The posted rules stated that "THE FAIR RESERVES THE RIGHT TO DENY ADMISSION TO ANYONE AT ANYTIME. . . . . [¶] NO 'COLORS' ALLOWED (E.G. BANDANAS, HANDKERCHIEFS HANGING FROM POCKETS) TO BE WORN IN A PROVOCATIVE MANNER. [¶] ALL PERSONS SUBJECT TO DRESS CODE & SEARCH." The dress code referred to in the rules stated in material part that "[n]o apparel or accessories intended to provoke, offend or intimidate others will be tolerated, including offensive slogans, insignia or 'gang colors.' "[2]

On January 28, 1999, approximately six months after he was ejected from the Fair, Gatto filed a claim against Sonoma County, the City of Santa Rosa and Officers Badger and Brazis pursuant to the "Government Claims Act."[3] (Gov. Code, § 910 et seq.) About six months later, on August 19, 1999,

---

[2] The dress code commenced with the statement that "[t]he Sonoma County Fair is intended for the enjoyment of the general public, particularly families, and to insure the quality of our family atmosphere. . . ." All fairgoers were asked to adhere to three policies, the second of which is the sentence just quoted. The first and third policies, not implicated in this litigation, state "[n]o apparel will display profanity" and "[n]o nudity."

[3] For the most part, the case law refers to this act as the Government Tort Claims Act or the Tort Claims Act. As has correctly been noted, however, the claim filing requirements of that act are not limited to tort claims, but extend also to claims for money or damages based on contract (*Baines Pickwick Ltd. v. City of Los Angeles* (1999) 72 Cal.App.4th 298, 300 [85 Cal.Rptr.2d 74]), and "Government Claims Act" is therefore a more appropriate label than Tort Claims Act.

Gatto's claim was rejected. The notice of rejection informed Gatto that "[s]ubject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim." The form notice went on to state, however, that "[t]his notice applies only to causes of action arising under California law for which a claim is mandated by the Government Tort Claims Act. . . . Other causes of action, including those arising under federal law, may have shorter time limitations for filing."

On September 10, 1999, 21 days after his claim was rejected, Gatto filed a complaint against Sonoma County, the City of Santa Rosa and Santa Rosa Police Officers Badger and Brazis. He subsequently amended the complaint to add Sonoma County Fair and Exposition, Inc., as a defendant.

On June 28, 2000, defendants filed a motion for judgment on the pleadings. Ten days later, on July 8, defendants moved to bifurcate trial and stay discovery "on the grounds that it is in the best interests of the parties, and for the sake of judicial economy, to have the legal questions addressed first, prior to conducting any further discovery." Gatto did not oppose the motion, and it was granted. A date for trial on all legal issues and briefing schedule was set for October 23, 2000, defendants' motion for judgment on the pleadings was taken off calendar, all the legal issues raised in that motion were ordered to be addressed at trial on the date set, and all discovery was stayed pending the outcome of that trial.

At hearings held on October 23 and November 3, 2000, after extensive briefing, the court addressed the legal issues raised in defendants' motion for judgment on the pleadings; namely, whether Gatto's complaint stated facts sufficient to constitute causes of action against defendants and whether those causes of action were barred by a one-year statute of limitations.

On December 29, 2000, the trial court found as a matter of law that the complaint "is not time-barred," and "that Sonoma County Fair and Exposition, Inc.'s dress code policy in effect on August 1, 1998, was unconstitutional." The court did not, however, explicitly determine whether enforcement of the dress code deprived Gatto of full and free access to accommodations in violation of the Unruh Civil Rights Act. (§ 51, subd. (b).) The court found that the City of Santa Rosa was not a proper defendant, because it did not adopt the dress code policy at issue, and dismissed it from the action. Officers Badger and Brazis were also dismissed from the action, as the court found them entitled to immunity under Government Code sections 820.4 and 820.6. (Dismissal of the city and two officers is not at

issue here.) On March 19, 2001, the court entered judgment awarding Gatto damages in the amount of $1,000, the minimum amount then specified for violations of the statutes Gatto invoked (§§ 52, subd. (a), 52.1, subd. (b)),[4] and attorney fees and costs in the combined amount of $23,700, as also authorized by statute. (§ 52.1, subd. (h).)

This timely appeal followed.

## DISCUSSION

One of the problems in this case, as will be seen, is the failure of the parties and the trial court to fully appreciate that the complaint posits two independent causes of action. The first alleges that "[i]n ordering plaintiff to leave the Sonoma County Fair because he refused to remove his clothing that bore the symbols of the Hells Angels Motorcycle Club, defendants . . . denied plaintiff the right to full and equal accommodations, privileges and services guaranteed by California Civil Code Section 51." This claim arises solely under section 51, subdivision (b), the central provision of the Unruh Civil Rights Act. The second cause of action alleges that the same conduct "interfered with and abridged plaintiff's right to free speech guaranteed by Article I, Section 2 of the California Constitution."[5] This claim, though based on the California Constitution, is enforceable, and Gatto seeks to enforce it, under subdivision (b) of section 52.1. Section 52.1, subdivision (b) provides that an individual whose exercise or enjoyment of rights secured by the state or federal Constitution "may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured." Unlike the first cause of action, which is purely statutory, Gatto's second claim is constitutional. The two claims must therefore be analyzed separately. At the time of trial, section 52—which applies to both access to accommodation claims under section 51 and civil actions for denial of constitutional rights under section 52.1 (§ 52, subds. (a), (b))—created liability for up to a maximum of three times the amount of actual damage suffered by any person denied specified rights "but

---

[4]The minimum figure was raised to $4,000 in 2001. (Stats. 2001, ch. 261, § 1.)

[5]Article I, section 2, subdivision (a) of the California Constitution provides that: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

in no case less than one thousand dollars ($1,000), and any attorney's fees that may be determined by the court in addition thereto . . . ."[6]

Appellants characterize this appeal as presenting but two questions: whether Gatto's complaint was filed after expiration of an applicable time limitation and, if not, whether the conduct complained of denied him any right arising under the California Constitution. In fact, the appeal also presents the question whether Gatto was denied his right to full and equal accommodations under section 51, subdivision (b). ■ If this statutory violation is established, it would be unnecessary for us to address the constitutional question, as constitutional issues ordinarily will be resolved on appeal only if "absolutely necessary" and not if the case can be decided on any other ground. (*Palermo v. Stockton Theatres* (1948) 32 Cal.2d 53, 65 [195 P.2d 1].)

■ As the issues presented are all entirely legal in nature, we employ our independent judgment. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960]; *Diamond Benefits Life Ins. Co. v. Troll* (1998) 66 Cal.App.4th 1, 5 [77 Cal.Rptr.2d 581].)

## I.

### *The Action Is Not Time-barred*

■ Unlike some other antidiscrimination statutes, such as the Fair Employment and Housing Act (see Gov. Code, § 12960), the statutes with which we are concerned do not contain their own statute of limitations. Gatto contends the applicable limitation is therefore the three-year period for "[a]n action upon a liability created by statute, other than a penalty or forfeiture." (Code Civ. Proc., § 338, subd. (a).) Appellants disagree and urge that the pertinent limitations period is the one-year period applicable to "[a]n action for . . . [an] injury to . . . one caused by the wrongful act or neglect of another . . ." (Code Civ. Proc., § 340). The trial court explicitly declined to determine which of these statutes applied, finding that even if the one-year period applied it was satisfied in this case because, as the court stated, "the Unruh [Civil Rights] Act is subject to the filing requirements of the California Tort Claims Act and, as such, when Defendant County of Sonoma served a letter on Plaintiff informing him that his tort claim had been rejected by the County of Sonoma, Plaintiff had an additional six months from the date of the rejection letter to file a complaint based upon the Unruh [Civil Rights] Act."

---

[6]By amendment that became effective January 1, 2002, the minimum damages prescribed by section 52 was raised to $4,000.

## A.

### *Gatto's Claims Are Subject to the One-year Statute of Limitations*

██ ▀█ ██ The trial court's avoidance of the question of whether the one-year or three-year statute of limitations applies to Unruh Civil Rights Act claims is understandable, as the case law on the subject is confusing.[7]

Appellants' contention that the pertinent statute of limitations is the one-year period applicable to actions seeking damages for injury caused by the wrongful act or neglect of another (Code Civ. Proc., § 340) rather than the three-year statute applicable to actions upon a liability created by statute (Code Civ. Proc., § 338, subd. (a)) rests most heavily on the recent opinion in *West Shield Investigations and Security Consultants v. Superior Court* (2000) 82 Cal.App.4th 935 [98 Cal.Rptr.2d 612] (*West Shield*). Stating that the matter was one of first impression (*id.* at p. 940) the *West Shield* court held that Unruh Civil Rights Act claims are subject to the one-year statute of limitations, apparently without regard to the nature of the liability sought to be imposed under that act.

*West Shield* was an action by a woman arising out of her forced attendance at a wilderness program for troubled youth when she was a teenager, brought against a security company that transported her to the camp and the operator of the camp. The plaintiff had been emancipated by court order before her 18th birthday and the action was not filed until more than a year later. The *West Shield* court held that the civil rights causes of action under the Unruh Civil Rights Act were subject to the one-year statute of limitations for personal injury actions, not the three-year period for liabilities created by statute, and that the statute began to run when the plaintiff was emancipated. At the commencement of its analysis, the court noted that "[n]o California state appellate court has ruled on the issue of the applicable statute of limitations for claims of Unruh Civil Rights Act violations" (*West Shield, supra,* 82 Cal.App.4th at p. 951) and that federal courts sitting in California had issued conflicting opinions.

In *Mitchell v. Sung* (N.D.Cal. 1993) 816 F.Supp. 597, the federal district court concluded that the applicable limitations period was the one-year

---

[7]As we later explain, the trial court correctly determined that Gatto's Unruh Civil Rights Act claim is subject to the Government Claims Act, and would therefore be timely even if the one-year statute applied. Accordingly, we too could avoid deciding whether the one or the three-year statute of limitations applies. However, because the issue is one of continuing public interest and likely to recur, and resolution of the perceived conflict in the case law may serve to avoid future litigation, we shall address the issue. (*Community Redevelopment Agency v. Force Electronics* (1997) 55 Cal.App.4th 622, 630 [64 Cal.Rptr.2d 209]; *Filipino Accountants' Assn. v. State Bd. of Accountancy* (1984) 155 Cal.App.3d 1023, 1030 [204 Cal.Rptr. 913].)

statute applying to personal injury actions, explaining that "[t]he Unruh [Civil Rights] Act seeks to protect against personal injury. Thus a one year statute of limitations period must be applied to plaintiff's Unruh Civil Rights Act claim." (*Id.* at p. 602.) However, as the *West Shield* court acknowledged, three other federal courts have concluded that the three-year statute applies. In *Olympic Club v. Those Interested Underwriters at Lloyd's London* (9th Cir. 1993) 991 F.2d 497, 501, fn. 11 (*Olympic Club*)), the Ninth Circuit Court of Appeals stated in dictum that the statute of limitations for claims under the Unruh Civil Rights Act is the three-year period for actions based on statutory liability provided by Code of Civil Procedure section 338, subdivision (a). Shortly after issuance of the opinion in *Olympic Club*, a federal court ruled in *Indep. Housing Services v. Fillmore Ctr.* (N.D.Cal. 1993) 840 F.Supp. 1328 (*Independent Housing Services*), that the three-year period established by Code of Civil Procedure section 338, subdivision (a), applied to the plaintiffs' Unruh Civil Rights Act claims, because liability under the access laws at issue (§§ 51 and 54.1) did not exist at common law. (*Independent Housing Services*, at p. 1359, citing *Jackson v. Cedars-Sinai Medical Center* (1990) 220 Cal.App.3d 1315, 1320 [269 Cal.Rptr. 877].) Finally, in *Kramer v. Regents of University of California* (N.D.Cal. 1999) 81 F.Supp.2d 972, 977, a third federal district court followed *Olympic Club* and *Independent Housing Services* in stating that the applicable statute of limitations for Unruh Civil Rights Act claims is the three-year limitations period for state statutory claims.[8]

■ Rejecting the determinations of the Ninth Circuit in *Olympic Club, supra,* 991 F.2d 497, and the federal district courts in *Independent Housing Services, supra,* 840 F.Supp. 1328, and *Kramer v. Regents of University of California, supra,* 81 F.Supp.2d 972, the *West Shield* court applied the one-year statute of limitations. (*West Shield, supra,* 82 Cal.App.4th at p. 952.) The court's reasoning deserves to be set forth at length: "Our analysis begins with a review of common law, because ' "[a] cause of action is based upon a *liability created by statute* ' "only where the liability is embodied in a statutory provision *and was of a type which did not exist at common law.*" ' " ' (*Briano v. Rubio* (1996) 46 Cal.App.4th 1167, 1177 [54 Cal.Rptr.2d 408] . . . .) Thus, where a cause of action is based upon a statute which did not 'create a new form of liability . . . but merely codified and refined existing law,' the section 338 three-year limitations period for actions based upon statutory liability does not apply. (*Briano v. Rubio, supra,* 46 Cal.App.4th at p. 1179.)

---

[8]After *West Shield* was decided, two federal district courts adopted its view that the one-year statute applies. (*Wilson v. Avemco Ins. Co.* (N.D.Cal. Feb. 14, 2002) 2002 WL 243633; *Pickern v. Best Western Timber Cove Lodge Marina Resort* (E.D.Cal. Jan. 18, 2002, No. Civ. S-00-1637 WBS/DA) 2002 WL 202442.)

"Accordingly, resolution of this issue depends upon whether the Act created a new form of liability, or whether liability for violation of civil rights is derived from common law. Our Supreme Court has indicated that common law contains the roots of the Act. 'The general policy embodied in [Civil Code] section 51 can be traced to early common law doctrine that required a few, particularly vital, public enterprises—such as privately owned toll bridges, ferryboats, and inns—to serve all members of the public without arbitrary discrimination.' (*Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 607 [42 Cal.Rptr.2d 50, 896 P.2d 776].) In 1897, 'California joined a number of other states in enacting its own initial public accommodation statute, the statutory predecessor of the current version of section 51 . . . [and in 1959] the Legislature undertook, through enactment of the Unruh Civil Rights Act, to revise and expand the scope of the then-existing version of section 51.' (*Id.* at pp. 607-608.)

"Thus, because the [Unruh Civil Rights] Act, as set forth in Civil Code section 51 et seq., constitutes a refinement and codification of existing common law liability for violation of civil rights, the applicable statute of limitations for claims under the Act is section 340, subdivision (3), the one-year limitations period for personal injury actions, rather than the section 338, subdivision (a), the three-year limitations period for liability created upon a statute. This conclusion is consistent with the statutory language of section 340, subdivision (3), which provides that the one-year limitations period applies to actions for 'injury to . . . one caused by the wrongful act or neglect of another.' Moreover, section 340, subdivision (3) 'has been interpreted to be "a special statute controlling the time within which *any action* covering such [personal] injury may be commenced, and it prevails over the general statute applicable to actions based upon a 'liability created by statute.' " ' (*Jackson v. Cedars-Sinai Medical Center* [, supra,] 220 Cal.App.3d 1315, 1322 . . . .)" (*West Shield, supra,* 82 Cal.App.4th at pp. 952-953.)

The *West Shield* court declared, finally, that its conclusion was consistent with rulings made in connection with "analogous" federal civil rights actions under 42 United States Code section 1983, as "[i]t is well established that [such] federal civil rights act claims are personal injury actions because the claims sound in tort. (*Wilson v. Garcia* (1985) 471 U.S. 261, 277-280 [105 S.Ct. 1938, 1947-1949, 85 L.Ed.2d 254].) Therefore, 'the appropriate statute of limitations is the statute of limitations for personal injury causes of action in the particular state in which the case is filed.' (*Jackson v. Cedars-Sinai Medical Center, supra,* 220 Cal.App.3d at p. 1323.)." (*West Shield, supra,* 82 Cal.App.4th at p. 953.)

We believe *West Shield* was correctly decided but that the court's analysis is incomplete and misleading. *West Shield* is unquestionably correct that

section 51, subdivision (b), codifies "existing common law liability for violation of civil rights." (*West Shield, supra*, 82 Cal.App.4th at p. 953.) However, *West Shield*'s analysis proceeds on the assumption that all Unruh Civil Rights Act claims are subject to the same statute of limitations. This assumption fails to attend to the complexity of the Unruh Civil Rights Act and the variety of claims that may be adjudicated under its rubric, some of which derive from the common law and some of which do not.

By its own terms, the Unruh Civil Rights Act comprises *only* section 51. Subdivision (a) of section 51 states: "This *section* shall be known, and may be cited, as the Unruh Civil Rights Act." (Italics added.) The courts, however, have consistently described as Unruh Civil Rights Act claims causes of action based under seemingly related provisions set forth in sections of the Civil Code that follow section 51. *West Shield* is a good example. That case presented no claim of denial of full and equal accommodations in violation of section 51; however, the court treated causes of action alleging interference with the exercise of constitutional rights under section 52.1, and sexual harassment under section 51.9 as Unruh Civil Rights Act claims. Similarly, section 51.9 was treated as an "Unruh Civil Rights Act claim" in *Brown v. Smith* (1997) 55 Cal.App.4th 767, 774-775 [64 Cal.Rptr.2d 301], as was section 54.1 in *Independent Housing Services, supra*, 840 F.Supp. 1328. Citing several state and federal opinions, the court in *Doe v. Petaluma City School Dist.* (N.D.Cal. 1993) 830 F.Supp. 1560 stated that "[i] t appears that section 52.1 is at least a 'component' of the Unruh Civil Rights Act." (*Id.* at p. 1581.) It is noteworthy, however, that in construing section 52.1, our Supreme Court explained that it was enacted by the Legislature "to stem a tide of hate crimes" (*Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 338 [70 Cal.Rptr.2d 844, 949 P.2d 941]) and never referred to it as part of the Unruh Civil Rights Act which, at least originally, dealt only with the issue of equal accommodations. Other courts have referred to section 52.1 and related statutes, including section 51.7, as part of the Bane Act. (See, e.g., *Bay Area Rapid Transit Dist. v. Superior Court* (1995) 38 Cal.App.4th 141, 144 [44 Cal.Rptr.2d 887]; *Boccato v. City of Hermosa Beach* (1994) 29 Cal.App.4th 1797, 1809 [35 Cal.Rptr.2d 282].) *In re Joshua H.* (1993) 13 Cal.App.4th 1734 [17 Cal.Rptr.2d 291] also refers to section 52.1 as part of the Bane Act but refers to section 51.7 as the "Ralph Civil Rights Act." (*Boccato*, at p. 1748, fn. 9.)

Reference to a statute or statutory scheme by the name of its author does not influence the meaning and effect of the enactment, but an erroneous denotation that includes one measure as part of another may obscure differences that are legally very significant. This is what appears to have happened to the Unruh Civil Rights Act, which is increasingly treated as an omnibus

antidiscrimination statute no longer limited to merely ensuring equal access to accommodations. For purposes of determining the applicable statute of limitations, this creates a problem, for the provisions now seen as parts of the Unruh Civil Rights Act do not all share the same common law provenance.

While it is true, as the *West Shield* court observed, that " '[t]he general policy embodied *in [Civil Code] section 51* can be traced to early common law doctrine . . .' " (*West Shield, supra,* 82 Cal.App.4th at pp. 952-953, italics added, quoting *Warfield v. Peninsula Golf & Country Club, supra,* 10 Cal.4th 594, 607),[9] it is not so clear that this can also be said of many other provisions of the Civil Code now commonly treated as parts of the Unruh Civil Rights Act.[10] Indeed, it is not even clear that this can be said of all of the provisions of the present version of section 51 itself. In 1992 the Legislature amended this central provision by adding subdivision (f), which states that "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) *shall also constitute a violation of this section.*" (Italics added.) The Legislature added this language

[9] Accord, *In re Cox* (1970) 3 Cal.3d 205, 214 [90 Cal.Rptr. 24, 474 P.2d 992]; *Marina Point Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 725 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161]. The basic common law principle "was set forth in *Lane* v. *Cotton* 88 Eng. Rep. 1458 . . . (1701) (Holt, C.J.): '[W]herever any subject takes upon himself a public trust for the benefit of his fellow-subjects, he is *eo ipso* bound to serve the subject in all the things that are within the reach and comprehension of such an office, under pain of action against him . . . . If on the road a shoe fall off my horse, and I come to a smith to have one put on, and the smith refuse to do it, an action will lie against him, because he has made profession of a trade which is for the public good, and has thereby exposed and vested . . . of himself in all the King's subjects that will employ him in the way of his trade. . . . If an innkeeper refuse to entertain a guest where his house is not full, an action will lie against him, . . . and so against a carrier, if his horses be not loaded, and he refuse to take a packet proper to be sent by a carrier . . . . *Id.* See also *Bell* v. *State of Maryland,* 378 U.S. 226, 296-304 [84 S.Ct. 1814, 1852-1857, 12 L.Ed.2d 822] (1964) (Goldberg, J., concurring) (discussing common law guarantee of access to public accommodations for all citizens); *Lombard* v. *Louisiana,* 373 U.S. 267, 275-77 [83 S.Ct. 1122, 1126-1127, 10 L.Ed.2d 338] (1963) (Douglas, J., concurring) (reviewing common law decisions regarding duty of nondiscrimination by innkeepers and carriers).' " (Comment, *The Unruh Civil Rights Act: An Uncertain Guarantee* (1983) 31 UCLA L.Rev. 443, 444, fn. 11.)

[10] In addition to sections 52.1, 51.9 and 54.1, these provisions include sections 51.3 (establishes and preserves specially designed accessible housing for senior citizens), 51.5 (prohibits boycotts or blacklists on the basis of race, creed, religion, color, national origin, sex, disability, or medical condition), 51.6 (prohibits price discrimination on the basis of gender), 51.7 (creates the right to be free from any violence, or threat of violence, because of race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute), 51.8 (prohibits franchisors from discriminating in the granting of franchises solely because of the race, color, religion, sex, national origin or disability of a prospective franchisee and the racial, ethnic, religious, national origin, or disability composition of the area in which the franchise is located), and 51.9 (creates liability for sexual harassment under specified circumstances).

to section 51 because it desired "to strengthen California law in this area [i.e., disability rights] where it is weaker than the Americans with Disabilities Act of 1990 . . . and to retain California law when it provides more protection for individuals with disabilities than the Americans with Disabilities Act of 1990 [(ADA)]." (Assem. Bill No. 1077, 1992 Stats., ch. 913, § 1, p. 4282.) The ADA protects the right of the disabled to "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . ." (42 U.S.C. § 12182(a)); it is therefore germane to the purpose of section 51 and, like it, derives from the common law. But the ADA also addresses *other* rights of the disabled, such as the rights to be free from discrimination in employment (42 U.S.C. § 12112) and to receive the benefits of the services, programs or activities of a public entity (42 U.S.C. § 12132), which are unrelated to public accommodations and do not derive from the common law.[11]

The present case, of course, presents only the question of the proper statute of limitations for claims under section 51, subdivision (b) and section 52.1. The foregoing discussion of other sections of the Civil Code is merely intended to illustrate the problem created by the lack of clarity as to which provisions of that code actually comprise the Unruh Civil Rights Act and the Legislature's failure to specify the statute or statutes of limitations applicable to provisions of the Civil Code commonly thought to be components of the Unruh Civil Rights Act. Because some of the provisions commonly treated by the courts as part of the Unruh Civil Rights Act derive from the common law and some do not, we conclude that no single statute of limitations applies to all. The one-year statute will apply to causes of action under provisions that evolved from the common law; the three-year statute will apply to others. Accordingly, our determination of the statute of limitations applicable to the specific claims before us does not necessarily apply to causes of action arising under provisions of the Civil Code not invoked in this case, even though they may also be described as Unruh Civil Rights Act claims.

---

[11]In *Independent Housing Services, supra,* 840 F.Supp. 1328, the plaintiffs sought relief under, among other statutes, section 51 and section 54.1, the latter of which provides physically disabled persons entitlement to full and equal access to housing accommodations offered for rent or lease. Explaining its presumption that the three-year period established by Code of Civil Procedure section 338, subdivision (a), was the proper statute of limitations for both claims, the court explained that "[n]o party has addressed the question of whether there are or were common law analogs to the access laws at issue here . . . . [and] the court is unaware of any such common law cause of action . . . ." (*Independent Housing Services,* at p. 1359.) Insofar as it applies to section 51, this statement is manifestly erroneous, as there is a common law analog to the right of access protected under section 51, and section 51 derives from that common law. (See discussion, *ante,* at p. 758, fn. 9.) The court may have been correct, however, that liability under section 54.1 is of a type which did not exist at common law, and the one-year statute of limitations therefore may not apply to claims under that section.

Gatto's complaint relies entirely on allegations of the denial of full and equal access to public accommodations guaranteed under section 51, subdivision (b), and free speech guaranteed under article I, section 2 of the California Constitution, which Gatto seeks to enforce under section 52.1. As we have seen, the first claim clearly derives from common law principles and is for that reason subject to the one-year statute. The second is analogous to a federal claim for personal injury under 42 United States Code section 1983 which, as the *West Shield* court correctly observed, sounds in tort (see *Wilson v. Garcia, supra,* 471 U.S. at pp. 277-280 [105 S.Ct. at pp. 1947-1949]), and this claim is therefore also subject to the one-year statute.

Because Gatto filed his action more than one year after the event, it is necessary to determine whether, as the trial court found, his Unruh Civil Rights Act claim is subject to the Government Claims Act, which therefore operated to extend the limitations period.

## B.

### *The Government Claims Act Applies and Operates to Extend the Limitations Period*

Appellants' argument that Gatto's causes of action, which they treat as Unruh Civil Rights Act claims, are not subject to the Government Claims Act (and the statute of limitations therefore was not extended) rests on the contention that, as stated in their opening brief, actions brought under that act "are primarily for declaratory or injunctive relief and any monetary damages sought are incidental to the equitable relief sought." This general contention, which is debatable, begs the question. First of all, as earlier pointed out, the provisions of the Civil Code with which we are concerned clearly reflect a legislative intention to authorize civil actions for damages, whether or not they also include requests for injunctive or other appropriate equitable relief. (§§ 52, 52.1.) It may well be, as appellants say, that many or perhaps even most actions under these statutes seek only injunctive or declaratory relief, and not damages, but that provides no reason to exempt such actions from claim findings requirements where the plaintiff *does* seek to recover damages from a public entity *and that is his or her chief purpose.*

Although appellants urge us to reject the statute of limitations determination in *Independent Housing Services, supra,* 840 F.Supp. 1328, they find support in that case for their contention that Unruh Civil Rights Act actions cannot be subjected to the claim filing requirement. Appellants misread the case. As earlier explained, *Independent Housing Services* was an action against the San Francisco Redevelopment Agency (Agency) and others for violations of federal, state, and local handicap access laws and the Unruh

Civil Rights Act. The plaintiff organizations, which brought suit on behalf of their disabled members, sought injunctive and declaratory . . . relief as well as damages. The Agency argued that the plaintiffs were required to file a written claim within one year of the accrual of their cause of action as a condition precedent to filing any civil action against the Agency seeking money or damages (Gov. Code, §§ 905, 905.2, 911.2), and no such claim was filed. The court disagreed, stating that "[t]he requirement of filing a claim within one year does not apply to actions brought *primarily* for declaratory . . . relief, even though *incidental* money damages are sought." (*Independent Housing Services*, at p. 1358, italics added, citing *M.G.M. Const. Co. v. Alameda County* (N.D.Cal. 1985) 615 F.Supp. 149, 151.) The court pointed out that "[w]hile plaintiffs do seek damages, their request for an injunction declaring that the Agency is in violation of the handicap access laws and must comply with them in the future is of great weight and not just ancillary to the request for damages. [Plaintiff's] potential damages are small and particularly inconsequential compared to the effect of the declarations it seeks. The court therefore finds that no statutory notice was required under the Tort Claims Act." (*Independent Housing Services*, at p. 1358.)

■ *Independent Housing Services* simply stands for the proposition that where a claimant seeks both damages and nonmonetary relief from a public entity in the same action, the applicability of the claim filing requirement turns on whether the damages sought are ancillary to the equitable relief also sought, in which case the claim filing requirement is inapplicable, or the reverse is true, in which case the filing requirement applies. The court concluded that the declaratory and injunctive relief sought by organizational plaintiffs dedicated to the vindication of the present and future rights of a large class of disabled persons was the primary purpose of the litigation, and the money damages they also sought was merely incidental to that overarching goal.

The opinion in *Independent Housing Services* is consistent with the view of state courts. For example, in *Loehr v. Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071 [195 Cal.Rptr. 576], the plaintiff, who had been discharged from employment with the community college district, instituted an action seeking both damages for his alleged wrongful termination and reinstatement. The defendants demurred on the ground that the complaint was barred by various statutes of limitation and, more particularly, by the plaintiff's failure to comply with the filing provisions of the Government Claims Act. Advancing an argument similar to that raised by appellants in this case, the plaintiff relied upon the general rule that the claims statutes do not apply to nonpecuniary actions, such as those seeking injunctive, specific or declaratory relief. (See generally *Minsky v. City of Los Angeles* (1974) 11 Cal.3d 113, 121 [113 Cal.Rptr. 102, 520 P.2d 726].) Since two of

his six causes of action sought such relief, the plaintiff maintained he was not obliged to file a timely claim with the district. Rejecting this argument and affirming the sustaining of the demurrers without leave to amend, the Court of Appeal pointed out that the rule has no application "where a petition for extraordinary relief is merely incidental or ancillary to a prayer for damages." (*Loehr v. Ventura County Community College Dist., supra,* at p. 1081.) As the court emphasized, the plaintiff's first three causes of action sought monetary damages for emotional and mental distress, pain and suffering, humiliation, and damage to reputation, and these actions "obviously fall within the terms of the Government Claims Act." (*Ibid.*) Recognizing "that in some situations a claimant may seek both damages and nonmonetary relief from a public entity in the same action, and thus invoke a basis of recovery which is not within the purview of the Tort Claims Act," the court concluded that this was not such a case. (*Ibid.*) *Loehr* and other state cases thus support the proposition that "an action for specific relief does not lose its exempt status solely because incidental money damages are sought." (*Snipes v. City of Bakersfield* (1983) 145 Cal.App.3d 861, 870 [193 Cal.Rptr. 760]; accord, *Eureka Teacher's Assn. v. Board of Education* (1988) 202 Cal.App.3d 469, 475 [247 Cal.Rptr. 790] [request for backpay and fringe benefits incidental to mandamus action for reemployment and therefore not subject to Government Claims Act]; *Harris v. State Personnel Bd.* (1985) 170 Cal.App.3d 639, 643 [216 Cal.Rptr. 274], disapproved on other grounds in *Coleman v. Dept. of Personnel Administration* (1991) 52 Cal.3d 1102, 1122, fn. 8 [278 Cal.Rptr. 346, 805 P.2d 300] [mandamus action for reinstatement and backpay not primarily for damages and therefore no claim needed to be filed].) The claims filing requirement remains applicable to actions in which money damages are not incidental or ancillary to any specific relief that is also sought, but the primary purpose of the action. (1 Cal. Government Tort Liability Practice (Cont.Ed.Bar 4th ed. 2001) Overview of Claim Procedures, § 5.53, p. 191.)

■ As in *Loehr v. Ventura County Community College Dist., supra,* 147 Cal.App.3d 1071 (and unlike *Independent Housing Services, Eureka Teacher's Assn.* and *Harris*), the trial court in this case impliedly found that the request for damages was not merely incidental to a transcendent interest in injunctive relief but was the primary relief sought. The reasons are not hard to find. Gatto, an individual who sued in his own behalf and never expressed interest in vindicating rights of anyone other than himself, expressed his personal pecuniary interest by filing a claim in which he informed the county that the damages he sought for the injury he suffered "exceed[] amount permitted by Government Code section 910 to be included in [the] claim," and that in a suit to be filed in "either State or Federal Court" he would seek not just injunctive relief but "attorney's fees and punitive damages in [the]

combined amount of $35,000.00." Nothing in the record suggests Gatto ever considered his interest in obtaining money damages subsidiary to his interest in injunctive relief. Damages are the first thing mentioned in the title of his complaint and the prayer for relief, and the title of the complaint cites the specific provisions of the Unruh Civil Rights Act creating liability for actual damages (§ 52, subd. (a)) and authorizing individuals to institute civil actions for such damages. (§ 52.1, subd. (b).) The fact that Gatto recovered only $1,000, then the minimum amount recoverable under section 52, is of no significance, as it is the fact, not the amount, of damages that is important. Moreover, putting aside the $23,700 he received in attorney fees and costs, the $1,000 Gatto recovered as damages was the *only* relief he obtained; the trial court found it unnecessary to grant injunctive relief because the operator of the Fair voluntarily withdrew or appropriately modified the dress code found to have been unconstitutional.

Exempting damage actions under sections 51 and 52.1 from the claim filing requirement, even in a case in which that is the primary relief sought, as appellants urge, would conflict with the statutory scheme relating to damage claims against public entities and with the relevant case law. "The 'purpose of the [statutory requirements for presenting claims against the state or a local public entity] is to facilitate early investigation of disputes and settlement without trial if appropriate, as well as to enable the public entity to engage in fiscal planning for potential liabilities and to avoid similar liabilities in the future.'" (*Lewis C. Nelson & Sons, Inc. v. Clovis Unified School Dist.* (2001) 90 Cal.App.4th 64, 72 [108 Cal.Rptr.2d 715], quoting *Baines Pickwick, Ltd. v. City of Los Angeles, supra,* 72 Cal.App.4th 298, 303.) Mindful of the mandatory nature of the claim filing requirements (see, e.g., Gov. Code, §§ 905, 905.2), a division of this district has held that the Legislature intended all claims for money or damages against a public entity to be governed by the statutory procedure "unless specifically exempted." (*Gehman v. Superior Court* (1979) 96 Cal.App.3d 257, 262 [158 Cal.Rptr. 62], disapproved on other grounds in *People ex rel. Dept. of Transportation v. Superior Court* (1980) 26 Cal.3d 744, 758, fn. 5 [163 Cal.Rptr. 585, 608 P.2d 673]; but see *Snipes v. City of Bakersfield, supra,* 145 Cal.App.3d 861, 868-869.) In Government Code section 905, the Legislature enumerated 12 types of claims against local public entities that are excepted from the mandatory filing requirement (Gov. Code, § 905, subds (a)-(*l*)); claims for damages for violation of sections 51 and 52.1 are not among them. As has been noted, "commentators have construed the section 905 exceptions as essentially non-tortious claims 'for which some other adequate claims procedure has already been devised, or for which the procedural protection of the Tort Claims Act is believed to be unnecessary.'" (*Dalton v. East Bay Mun. Utility Dist.* (1993) 18 Cal.App.4th 1566, 1574 [23

Cal.Rptr.2d 230], quoting Cal. Gov. Tort Liability Practice (Cont.Ed.Bar 1992) § 6.24, pp. 651-652.)

■ Exceptions to the filing requirement not specifically enumerated in the Government Claims Act have occasionally been allowed, but only where the claim is based on a statute or statutory scheme that includes a functionally equivalent claim process. *Snipes v. City of Bakersfield, supra,* 145 Cal.App.3d 861 is illustrative. That case was an action against a city and its police department for employment discrimination under the Fair Employment and Housing Act. (Gov. Code, § 12900 et seq.) (FEHA).) The trial court sustained a general demurrer without leave to amend on the ground that the plaintiff failed to allege that he complied with the claim filing requirement of the Government Claims Act. The Court of Appeal reversed, holding "that the purposes and procedures of the FEHA demonstrate a legislative intent that actions against governmental entities brought under the FEHA are to be excepted from the general requirements of the Tort Claims Act." (*Snipes,* at p. 865.) After describing the statutory scheme in considerable detail, the court explained its reasoning: "The procedural guidelines and the time framework provided in the FEHA are special rules for this particular type of claim which control over the general rules governing claims against governmental entities. The FEHA not only creates a statutory cause of action, but sets out a comprehensive scheme for administrative enforcement, emphasizing conciliation, persuasion, and voluntary compliance, and containing specific limitations periods." (*Id.* at p. 868, italics omitted.) The statutes Gatto relies upon contain no comparable provisions, and there is, therefore, no reason to exempt actions under those statutes from the claim filing requirement when the primary relief sought against the state or a local public entity is money damages.

The fact that federal civil rights claims under 42 United States Code section 1983 are exempt from the requirements of the Government Claims Act also provides no reason to exempt claims under sections 51 and 52.1, despite the similarity of the claims that can be made under the federal and state statutes. ■ Section 1983 claims are exempt from the state claims requirements because the supremacy clause of the United States Constitution does not permit a state law to alter or restrict federally created rights. As our Supreme Court has noted, "the filing of a claim for damages 'is more than a procedural requirement, it is a condition precedent to plaintiff's maintaining an action against defendants, in short, an integral part of plaintiff's cause of action.' And while it may be constitutionally permissible for the Legislature to place this substantive impediment in the path of a state cause of action, it is clear that the supremacy clause will not permit a like abrogation of the perquisites of a federal civil rights litigant." (*Williams v. Horvath* (1976) 16 Cal.3d 834, 842 [129 Cal.Rptr. 453, 548 P.2d 1125].) ■ Conditioning

damage claims against public entities under the Unruh Civil Rights Act (however it may be defined) on compliance with the Government Claims Act presents no such constitutional problem.

For the foregoing reasons, the trial court correctly concluded that the Government Claims Act applied to this action and extended the limitations period beyond the one year specified in section 340 of the Code of Civil Procedure. Because Gatto filed his complaint in the superior court within six months from the date of the notice he received of the rejection of his claim (Gov. Code, §§ 911.8, subd. (b), 913, subd. (b)), it was not time-barred.[12]

## II.

### *Appellants Did Not Deny Gatto Free and Equal Access to Accommodations Under the Unruh Civil Rights Act*[13]

 ██ ██ Only two of the many cases cited and discussed by the parties genuinely bear upon Gatto's purely statutory claim that enforcement of appellants' dress code denied him equal access to accommodations and services, as required by section 51, subdivision (b): the Supreme Court's opinion in *Marina Point, Ltd. v. Wolfson, supra,* 30 Cal.3d 721 (*Marina*

---

[12]This determination makes it unnecessary for us to inquire whether, because Sonoma County informed Gatto he had six months from the date of the rejection of his claim to file a lawsuit in state court, appellants are equitably estopped from asserting the bar of the statute of limitations. (See *Halus v. San Diego County Assessment Appeals Bd.* (S.D.Cal. 1992) 789 F.Supp. 327, 330.)

[13]The trial court did not explicitly rule on Gatto's claimed violation of his right to full and equal access to accommodations under the Unruh Civil Rights Act (§ 51, subd. (b)) although, as earlier noted, the complaint separately alleged violations of section 51, subdivision (b), and the right to free speech under article I, section 2 of the California Constitution. We ascribe this omission to the frequent conflation of the statutory and constitutional issues by the parties. For example, although Gatto maintained he was denied access to the fair because the apparel he was wearing identified him as a member of a motorcycle club, which he claims is a class protected under section 51, he also argued he was denied access because he was exercising a right of free speech. We treat this argument as a constitutional claim, because, as we later explain, Gatto is not a member of a class protected under section 51. However, the fact that the parties sometimes referred to both causes of action as constitutional claims is apparently the reason the trial court failed to more clearly distinguish them.

The failure of the court to explicitly rule on the equal access claim creates a potential procedural problem, as the "one final judgment rule" (Code Civ. Proc. § 904.1, subd. (a)(1)) ordinarily prohibits an appeal taken from a judgment that fails to dispose of all causes of action between the parties. (*Angell v. Superior Court* (1999) 73 Cal.App.4th 691, 697 [86 Cal.Rptr.2d 657].) On the other hand, when the trial court's "failure to dispose of all causes of action is a result of judicial 'inadvertence or mistake rather than a deliberate intention to retain the remaining causes of action for trial,' the appellate court can amend the judgment to include the intended but omitted ruling essential to a complete disposition of the action." (Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group) ¶ 2:69, p. 2-33, quoting *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 921 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]; see also *Gombos v. Ashe* (1958) 158 Cal.App.2d 517,

*Point*), which Gatto relies upon, and the recent Court of Appeal opinion in *Hessians Motorcycle Club v. J. C. Flanagans* (2001) 86 Cal.App.4th 833 [103 Cal.Rptr.2d 552] (*Hessians*), which appellants claim is dispositive.

*Marina Point* presented the question whether an owner of an apartment complex may lawfully refuse to rent any of its apartments to a family solely because the family includes a minor child. In the landlord's action to eject the family, the municipal court found that " '[c]hildren are rowdier, noisier, and more mischievous and more boisterous than adults,' " and upheld the landlord's policy of excluding all families with minor children. (*Marina Point, supra,* 30 Cal.3d at p. 724.) Focusing exclusively on the equal access to business establishment provisions of the Unruh Civil Rights Act (§ 51, subd. (b)), the Supreme Court reversed. The high court held, among other things, that the antidiscrimination provisions of section 51 are not confined only to a limited category of protected classes, but protect all persons from any arbitrary discrimination by a business establishment. In the course of explaining this holding, the court stated that "the basic rights guaranteed by section 51 would be drastically undermined if, as the landlord contends, a business enterprise could exclude from its premises or services entire classes of the public simply because the owner of the enterprise had some reason to believe that the class, taken as a whole, might present greater problems than other groups. Under such an approach, for example, members of entire occupations or avocations, e.g., sailors or *motorcyclists*, might find themselves excluded as a class from some places of public accommodation simply because the proprietors could show that, as a statistical matter, members of their occupation or avocation were more likely than others to be involved in a disturbance." (*Marina Point,* at p. 739, italics added.)

Emphasizing the reference to "motorcyclists," Gatto interprets *Marina Point* as establishing that section 51, subdivision (b), protects not only against discrimination on the bases enumerated in the statute ("sex, race, color, religion, ancestry, national origin, disability or medical condition"), but also prohibits the denial of full and equal access to individuals who are not members of a specifically protected class, but are thought to be likely to create problems. This argument ignores a significant difference between the

---

524 [322 P.2d 933], disapproved on other grounds in *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 899 [157 Cal.Rptr. 693, 598 P.2d 854].)

The trial court's failure to expressly rule on Gatto's equal access claim appears to have been an oversight. In the apparent belief it ruled on all issues presented, the court gave no indication it thought any issues remained for its determination. Appellants have never contended that the judgment was not final and appealable and at oral argument all parties expressed the belief that the judgment in Gatto's favor was complete. We conclude the court intended to rule in Gatto's favor on his purely statutory cause of action as well as on his constitutional claim, and amend the judgment accordingly.

facts of this case and those of *Marina Point.* There was nothing the families with minor children excluded from housing in *Marina Point* could reasonably do to gain entrance, whereas Gatto would have been admitted to the Fair if he complied with the dress code. Gatto also ignores significant developments in judicial application of section 51, subdivision (b), during the 20 years since *Marina Point* was decided.

The jurisprudential developments Gatto ignores are precisely the ones assayed and relied upon in *Hessians, supra,* 86 Cal.App.4th 833, the Unruh Civil Rights Act case upon which appellants rely. *Hessians* is also more factually similar to the present case than *Marina Point.*

*Hessians* was an Unruh Civil Rights Act action against a sports bar that denied admittance to members of two motorcycle clubs when they refused to comply with the bar's policy requiring them, before entering, to remove their "colors," that is, the patch on their motorcycle jacket signifying membership in a particular club. The policy was based on the belief of the managers of the bar that allowing colors to be worn would lead to fights between rival motorcycle gangs in the bar. The trial court entered judgment for the bar and the Court of Appeal affirmed.

The Court of Appeal acknowledged that, in addition to the particular forms of discrimination specifically outlawed by section 51 (sex, race, color, etc.), courts have held that the Unruh Civil Rights Act also prohibits discrimination based on several classifications not specifically identified in section 51, such as families with minor children, as in *Marina Point,* including discrimination based on unconventional dress and appearance, as in *In re Cox, supra,* 3 Cal.3d 205, 217-218. (*Hessians, supra,* 86 Cal.App.4th at p. 836.) However, as the *Hessians* court went on to point out, in *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142 [278 Cal.Rptr. 614, 805 P.2d 873] (*Harris*) the Supreme Court "reexamined these earlier decisions which treated the list of statutory classifications as ' "illustrative rather than restrictive" ' (*id.* at p. 1152) and cautioned against extending the [Unruh Civil Rights] Act's reach any further. '[W]ere we writing on a clean slate, the repeated emphasis in the language of sections 51 and 52 on the specified classifications of race, sex, religion, etc., would represent a highly persuasive, if not dispositive, factor in our construction of the Act. [Citation.]' (*Id.* at p. 1159.) The [*Harris*] court concluded 'the Legislature intended to confine the scope of the Act to the . . . types of discrimination' specifically identified in the statute. (*Id.* at p. 1155.) [¶] Despite this conclusion, the *Harris* court did not overrule the prior cases which extended the Act to certain nonenumerated classifications. (*Harris, supra,* 52 Cal.3d at p. 1155.) The court did, however, adopt a new, narrower construction of the Act and

'made it clear *future expansion* of prohibited categories should be carefully weighed to ensure a result consistent with legislative intent. [Citations.]' (*Beaty v. Truck Ins. Exchange* (1992) 6 Cal.App.4th 1455, 1462 [8 Cal.Rptr.2d 593], italics added.) To that end, the court engaged in a three-step inquiry in considering (and rejecting) application of the Act to 'economic' discrimination—the 'new' classification at issue in that case. (*Harris, supra*, 52 Cal.3d at pp. 1159-1169 [analyzing (1) the language of the statute, (2) the legitimate business interests of the defendants, and (3) the consequences of allowing the new discrimination claim].) In the wake of *Harris*, courts have consistently followed this three-part analysis when determining whether discrimination which implements a 'new' classification is prohibited by the Act. (See, e.g., *King v. Hofer* (1996) 42 Cal.App.4th 678, 682 [49 Cal.Rptr.2d 719]; *Beaty v. Truck Ins. Exchange, supra*, 6 Cal.App.4th at pp. 1462-1465; *Gayer v. Polk Gulch, Inc.* [1991] 231 Cal.App.3d [515,] p. 521 [282 Cal.Rptr. 556].)" (*Hessians, supra*, at p. 836.)[14]

The *Hessians* court rejected the plaintiffs' assertion that their exclusion from the bar on the basis of unconventional appearance, though not a classification enumerated in section 51, was nevertheless recognized in *In re Cox, supra*, 3 Cal.3d 205, 217-218, which was left standing by *Harris*. As the court explained, "Flanagans did not refuse to admit the Hessians because their appearance or clothing was unconventional. The Hessians concede 'bikers' wearing full motorcycle regalia are welcomed in the bar. Its management does not blink at long hair, leather or tattoos. The only part of the Hessians' outfit considered objectionable was an accompanying patch—signifying allegiance to a particular club (and signifying 'trouble' to the bar). It was this patch alone which kept the Hessians out of Flanagans. This is not discrimination based on a person's unconventional *appearance* as recognized in *Cox* and *Harris*." (*Hessians, supra*, 86 Cal.App.4th at p. 837, italics in original.) We agree.[15]

Gatto's response to the reasoning set forth in *Hessians* is that it applies only to private venues, "not [to] a public event sponsored by a public entity

---

[14]It is also noteworthy that in 1996 the Legislature amended the Unruh Civil Rights Act in order to clarify the holdings in *Marina Point* and *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427]. Section 51.10, subdivision (a), states that section 51 "shall be construed to prohibit a business establishment from discriminating in the sale or rental of housing based upon age," but permits such an establishment to "establish and preserve housing for senior citizens pursuant to Section 51.11," which allows certain age restrictions.

[15]Erroneously believing section 51, subdivision (b), covers discrimination against motorcycle club members wearing colors, Gatto does not alternatively argue that we should extend the statute to such a classification. Suffice it therefore for us merely to note that the plaintiff in *Hessians* did make this alternative argument and, applying the three-part inquiry laid out in *Harris, supra*, 52 Cal.3d at pages 1159-1169, the *Hessians* court rejected it. (*Hessians, supra*, 86 Cal.App.4th at pp. 837-838.)

for which city police officers were employed to enforce a dress code." This argument ignores the fact that, by its own terms, the equal access in accommodations provision of the Unruh Civil Rights Act applies to "all business establishments of every kind whatsoever" (§ 51, subd. (b)). The analysis of that provision set forth in *Hessians*, with which we agree, is therefore as applicable to a county fair as to a private drinking establishment.

For the foregoing reasons, enforcement of the dress code against Gatto did not violate his right to full and equal accommodations under the Unruh Civil Rights Act. (§ 51, subd. (b).)

## III.

### *The Dress Code Is Void for Vagueness and Overbroad*

 Emphasizing that the free speech provisions of the California Constitution are " 'more protective, definitive and inclusive of rights to expression of speech than their federal counterparts. . . .' " (*San Diego Unified Port Dist. v. U.S. Citizens Patrol* (1998) 63 Cal.App.4th 964, 970 [74 Cal.Rptr.2d 364], quoting *Lopez v. Tulare Joint Union High School Dist.* (1995) 34 Cal.App.4th 1302, 1327 [40 Cal.Rptr.2d 762]), Gatto argues that the dress code is void for vagueness and impermissibly overbroad. Though these claims are logically related (*Kolender v. Lawson* (1983) 461 U.S. 352, 358, fn. 8 [103 S.Ct. 1855, 1859, 75 L.Ed.2d 903]), they are distinct.

Preliminarily, we note that the abbreviated record in this case does not permit us to confidently determine whether Gatto's use of an insignia of the Hell's Angel Motorcycle Club constituted protected speech. The insignia itself was not received in evidence. Nor does the record show whether Gatto is a member of the Hell's Angels, whether the Hell's Angels espouse a political view or other ideas entitled to constitutional protection,[16] or whether Gatto wore its insignia with the intent to convey a particularized

---

[16]A report on the Hell's Angels prepared by the California Department of Justice in 1965 describes numerous "Hoodlum Activities" attributed to club members by law enforcement agencies, and their "Crime Characteristics," but the report does not attribute any socio-political beliefs to members of the organization. (Cal. Dept. of Justice, Hell's Angels Motorcycle Clubs (Mar. 15, 1965); see also *U.S. v. Barger* (9th Cir. 1991) 931 F.2d 359.) Hunter S. Thompson, the author of a much more penetrating study of the Hell's Angels, concludes that "[t]he Hell's Angels are not visionaries, but diehards, and if they are the forerunners or the vanguard of anything it is not the 'moral revolution' in vogue on college campuses [in the 1960s], but a fast-growing legion of young unemployables whose untapped energy will inevitably find the same kind of destructive outlet that 'outlaws' like the Hell's Angels have been finding for years." (Thompson, Hell's Angels: The Strange and Terrible Saga of the Outlaw Motorcycle Gangs (1966) at p. 248.) According to Thompson, the insignia of the Hell's Angel, and particularly their "swastika fetish," "is no more than an antisocial

message and there was a great likelihood the message would be understood by those observing it (*Spence v. Washington* (1974) 418 U.S. 405, 410-411 [94 S.Ct. 2727, 2730-2731, 41 L.Ed.2d 842]), not merely as a fashion statement.[17] The failure of the evidence as to this issue is not, however, dispositive. Gatto's vagueness claim rests on the asserted inadequate notice of proscribed behavior, which is "completely distinguishable from and not dependent upon any free speech considerations." (*Rios v. Lane* (7th Cir. 1987) 812 F.2d 1032, 1039; accord, *Stephenson v. Davenport Community School Dist.* (8th Cir. 1996) 110 F.3d 1303, 1307; see also *Smith v. Goguen* (1974) 415 U.S. 566, 582 [94 S.Ct. 1242, 1251-1252, 39 L.Ed.2d 605] [holding statute void for vagueness without determining whether the plaintiff actions constituted protected speech].) Gatto's overbreadth argument also does not require him to show denial of his right of free speech. ▮ Because of the potential chilling effect on the protected activities of others, overbreadth analysis is an exception to the general rule that an individual is not permitted to litigate the rights of third parties; an individual may therefore assert this claim without showing that his or her activities are protected by the First Amendment.[18] (*Brockett v. Spokane Arcades, Inc.* (1985) 472 U.S. 491, 503-504 [105 S.Ct. 2794, 2801-2802, 86 L.Ed.2d 394];

---

joke, a guaranteed gimmick to bug the squares . . . ." (*Id.* at p. 236.) The "1 %-er" badge Hell's Angels commonly wear "means that they are proud to be part of the alleged one percent of bike riders whom the American Motorcycle Association refuses to claim." (*Id.* at p. 9.) It is an interesting question whether the communication of such sentiments, perhaps better described as an attitude, constitutes protected speech, but we find it unnecessary to undertake the inquiry.

[17]As one court has noted, "[t]he wearing of a particular type or style of clothing usually is not seen as expressive conduct." (*Bivens by Green v. Albuquerque Public Schools* (D.N.M. 1995) 899 F.Supp. 556, 560 [school dress code prohibiting "sagging" does not violate First Amendment]; *Freeman v. Flake* (10th Cir. 1971) 448 F.2d 258, 260-261 [school regulation of student hair length does not violate First Amendment; wearing of hair not akin to free speech], cert. den. 405 U.S. 1032 [92 S.Ct. 1292, 31 L.Ed.2d 489]; *New Rider v. Board of Ed. of Ind. Sch. Dist. No. 1, Okl.* (10th Cir. 1973) 480 F.2d 693, cert. den. 414 U.S. 1097 [94 S.Ct. 733, 38 L.Ed.2d 556]; *Hatch v. Goerke* (10th Cir. 1974) 502 F.2d 1189 [same, even where students are Native Americans wearing long braided hair as symbol of religion and culture]; *Olesen v. Bd. of Educ. of School Dist. No. 228* (N.D.Ill. 1987) 676 F.Supp. 820, 822 [First Amendment does not protect wearing of earring to express individuality].) Cases according First Amendment protection to the wearing armbands that signify membership in the American Nazi Party (*Collin v. Smith* (7th Cir. 1978) 578 F.2d 1197, 1201) and hoods and robes identifying the wearer as a member of the Ku Klux Klan (*Hernandez v. Superintendent* (E.D.Va. 1992) 800 F.Supp. 1344; *Ku Klux Klan v. Martin Luther King Worshippers* (M.D.Tenn. 1990) 735 F.Supp. 745, 751) are inapposite because it was shown in those cases, as it has not been shown here, that the insignia and apparel at issue served to express a *constitutionally protected political viewpoint.*

[18]The reason a litigant whose own conduct is not protected by the First Amendment is permitted to call judicial attention to a regulation's potential unconstitutional application to third parties "is that there is not likely to be a better party. Those whose expression is 'chilled' by the existence of an overbroad or unduly vague statute cannot be expected to adjudicate their own rights, lacking by definition the willingness to disobey the law. In addition, such

*Broadrick v. Oklahoma* (1973) 413 U.S. 601, 610 [93 S.Ct. 2908, 2914-2915, 37 L.Ed.2d 830].)

 Moreover, the constitutional rights that may be affected by a dress code are not limited to those arising under the free speech clause of the First Amendment. There is considerable authority for the proposition that, even if he or she is not engaged in protected speech, a plaintiff challenging a dress code may have a liberty interest protected under the due process clause of the Fourteenth Amendment.

Because it is so factually similar to this case, *Hodge v. Lynd* (D.N.M. 2000) 88 F.Supp.2d 1234 (*Hodge*) is particularly instructive on this issue. There, a minor was excluded by deputy sheriffs from a county fair and rodeo for wearing a baseball cap with the brim facing backward. The fair had been advertised and promoted as a family event and fair officials instructed the sheriff's department "that there should be zero tolerance for gang activity at the fair, and no tolerance for inappropriate behavior." (*Id.* at p. 1236.) The sheriff's department had received intelligence reports that wearing baseball caps backward "could be a gang symbol" (*ibid.*), and the deputy sheriff who enforced the county's rules viewed such clothing as similar to that worn by gang members. The county maintained that the minor's choice of clothing or appearance was not a form of protected speech, because his cap contained no written communications or symbols of any kind. The court agreed but found that the lack of First Amendment protection for choice of dress did not mean it lacked all constitutional protection. Acknowledging that the Supreme Court had not yet addressed the issue, the court agreed with several federal courts which have held that an individual's choice of personal dress or appearance is a liberty interest protected under the due process clause. (*Id.* at pp. 1238-1239, citing *Stephenson v. Davenport Community School Dist, supra,* 110 F.3d 1303, 1307; *Rathert v. Village of Peotone* (7th Cir. 1990) 903 F.2d 510, 514; *DeWeese v. Town of Palm Beach* (11th Cir. 1987) 812 F.2d 1365, 1367; *Domico v. Rapides Parish School Bd.* (5th Cir. 1982) 675 F.2d 100, 101; *East Hartford Ed. Ass'n v. Bd. of Ed. etc.* (2d Cir. 1977) 562 F.2d 838, 842; and *Lesser v. Neosho County Community College* (D.Kan. 1990) 741 F.Supp. 854, 861.) *Hodge* agreed "that deciding what clothes to wear and what appearance to present to the rest of the world are personal decisions, constitutionally protected from arbitrary government interference" and held that "there is a liberty interest in one's choice of clothing, grooming, and other aspects of personal appearance, under the Due Process Clause

deterred persons may not have standing to obtain affirmative relief, since the hypothetical 'chilling effect' of the mere existence of an overbroad or vague law does not by itself constitute the sort of 'injury-in-fact' which confers standing." (Tribe, American Constitutional Law (2d ed. 1988) § 12-32, p. 1035, fns. omitted, citing *Gooding v. Wilson* (1972) 405 U.S. 518, 521 [92 S.Ct. 1103, 1105-1106, 31 L.Ed.2d 408] (dictum) and *Laird v. Tatum* (1972) 408 U.S. 1, 13-16 [92 S.Ct. 2318, 2325-2327, 33 L.Ed.2d 154].)

of the United States Constitution." (*Hodge*, at p. 1239.) However, because it is less significant than other, more fundamental rights, such as speech, religion and marital privacy, alleged infringement of the judicially recognized liberty interest in personal dress or appearance is subjected to the rational basis test rather than more stringent scrutiny. (*Id.* at pp. 1242-1243.)

In sum, even if a person's choice of dress and manner of appearance does not constitute the sort of expressive conduct protected by the First Amendment, it is nevertheless a form of individual expression that is constitutionally entitled to some protection against arbitrary governmental suppression. We agree with the *Hodge* court's articulation of this principle, and do not consider the matter trivial.[19] (*Karr v. Schmidt* (5th Cir. 1972) 460 F.2d 609, 621 (dis. opn. of Wisdom, J.) ["[f]orced dress . . . humiliates the unwilling complier, forces him to submerge his individuality in the 'undistracting' mass, and in general, smacks of the exaltation of organization over member, unit over component, and state over individual"].)

*Hodge* is useful not just because it is among the cases establishing that a person has an authentic liberty interest in his or her choice of clothing and appearance but, more importantly, because it appears to be the only extant judicial opinion exploring the relationship between that individual interest and the nature and extent of a county's potentially conflicting right to exclude individuals from a county fair on the basis of a dress code.

The court commenced its analysis of this relationship by examining the legitimacy of the county's interest in imposing dress restrictions on fair patrons. As the court observed, judicial treatment of government-imposed dress codes has usually depended on the nature of the arena in which the restriction was imposed. Government regulation of dress or appearance on public streets has not fared well (*Hodge, supra,* 88 F.Supp.2d at p. 1243, citing, inter alia, *DeWeese v. Town of Palm Beach, supra,* 812 F.2d 1365 [no rational basis for ordinance prohibiting men from appearing in public without a shirt]), but dress codes applicable to more restricted environments,

---

[19]Apparently concerned that the right to wear a baseball cap backward could be seen as too inconsequential to warrant constitutional protection, the *Hodge* court took the trouble to recount some historical examples of excessive governmental restrictions on dress and appearance. "In China, following the Manchu invasion of 1644, the conquerors required the population to wear a prescribed hair style and prescribed clothing, and killed those who did not obey; in Russia, also in the 17th century, Peter the Great imposed a heavy tax on beards that had religious significance for Russian Orthodox men, in an attempt to force a more Western lifestyle on his country." (*Hodge, supra,* 88 F.Supp.2d at p. 1239, fn. 2, citing *East Hartford Ed. Ass'n v. Bd. of Ed. etc., supra,* 562 F.2d at p. 842.) Recent efforts of the Taliban government of Afghanistan to require men to wear beards and women to wear concealing burkas demonstrate that the authoritarian impulse of some governments to control dress is still alive in the world.

such as schools, have often been upheld. (*Hodge, supra,* at p. 1243, citing, inter alia, *Domico v. Rapides Parish School Bd., supra,* 675 F.2d 100, 101 and *East Hartford Ed. Ass'n v. Bd. of Ed. etc., supra,* 562 F.2d 838, 842.) The *Hodge* court determined that a county fair occupies a "middle zone" of interests, as it involves "an event that is open to the public but is put on for a particular purpose," and found "that a governmental entity sponsoring an event such as the Fair has a legitimate interest in fostering a non-violent, family atmosphere, because this atmosphere is consistent with the purpose of the event being sponsored. In connection with that interest, the Fair has the authority to impose rules of conduct designed to advance this goal." (*Hodge,* at pp. 1243-1244, fn. omitted; see also *Jeglin v. San Jacinto Unified School Dist.* (C.D.Cal. 1993) 827 F.Supp. 1459, 1460-1461.)

Since a county fair is not an event in which a particular mode of dress is part of the purpose, such as a black-tie affair, the government sponsor could not legitimately enforce a dress code requiring a particular style of clothing; but it "did have a legitimate interest in imposing a dress code banning clothing that other patrons would find threatening, or that could potentially trigger angry or even violent responses from those other patrons. Such clothing would be inimical to the family-oriented, safe atmosphere that was part of the purpose for the Fair." (*Hodge, supra,* 88 F.Supp.2d at p. 1244.)

Finally, despite its finding of the legitimacy of the fair's interest, the *Hodge* court found that the dress code in that case did not pass constitutional muster because it was both vague and overbroad. The restriction was vague due to the "notoriously imprecise" meaning of the word "gang" and because the meaning of "gang activity" is "as varied as the background and perspective of those attempting to define it" (*Hodge, supra,* 88 F.Supp.2d at pp. 1244-1245, citing *Stephenson v. Davenport Community School Dist, supra,* 110 F.3d at 1309), and the lack of specificity left enforcement of the dress code to the unfettered discretion of law enforcement officers. (*Hodge,* at p. 1245.) It was overbroad because a substantial number of non-gang-related youths also favor the wearing of baseball caps backward, and there was no reason to believe "a member of the general public, seeing [the plaintiff and his friends] wearing their caps backward, would have thought they were gang members and would have reacted fearfully or in a confrontational manner." (*Id.* at p. 1244.) In short, the restriction, based merely on intelligence reports that wearing a cap backward "could" be indicative of gang activity, was not rationally related to the county's legitimate goal of preventing the wearing of clothing which, in and of itself, would threaten the family-oriented atmosphere of the fair. (*Ibid.*)

Though different from the dress code in *Hodge,* the one before us suffers the same infirmities. ■ A regulation is constitutionally void on its

face when, as matter of due process, it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application" (*Connally v. General Const. Co.* (1926) 269 U.S. 385, 391 [46 S.Ct. 126, 127-128, 70 L.Ed. 322]; *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1115 [60 Cal.Rptr.2d 277, 929 P.2d 596]). The void for vagueness doctrine is designed to prevent arbitrary and discriminatory enforcement. (*Smith v. Goguen, supra,* 415 U.S. 566, 573 [94 S.Ct. 1242, 1247]; *Ketchens v. Reiner* (1987) 194 Cal.App.3d 470, 477 [239 Cal.Rptr. 549].) The problem with a vague regulation is that it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis . . . ." (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 108-109 [92 S.Ct. 2294, 2299, 33 L.Ed.2d 222], fn. omitted.)

 Appellants' dress code states: "No apparel or accessories intended to provoke, offend or intimidate others will be tolerated, including offensive slogans, insignia or 'gang colors.' " The first difficulty with this restriction is the imprecision of the phrase "gang colors."[20] (See *City of Harvard v. Gaut,*

[20]*City of Harvard v. Gaut* (1996) 277 Ill.App.3d 1 [214 Ill.Dec. 68, 660 N.E.2d 259], provides a useful discussion of the problem presented by restrictions on the wearing of "gang colors." In that case the defendant was convicted of violation of a municipal ordinance that made it "unlawful for any person within the City to wear known gang colors, emblems, or other insignia . . . ." (*Id.* at p. 2 [660 N.E.2d at p. 260], italics omitted.) The appellate court reversed, holding that the ordinance was facially overbroad. The gang symbol alleged in the case was a six-pointed star the police believed was a symbol of the Gangster Disciples street gang, though they acknowledged it was also "a symbol of Judaism as well as of the gangs affiliated with the Folk Nation." The officers involved also "acknowledged that 'gang colors' and 'gang symbols' include a wide and undefined range of clothing and jewelry and that, in most cases, these colors or symbols are not necessarily gang related. According to Officer Lunsmann, the best-known gang 'colors' were black and gold (Latin Kings and other People Nation affiliates) and blue and black (Folk Nation affiliates). However, Lunsmann acknowledged that black and gold are also the official colors of Harvard High School. He further acknowledged that blue and black clothing may be a gang symbol, particularly when displayed via a Duke University baseball cap, which is also a Folk Nation emblem. However, people with no known gang connections wear Duke hats and other blue-black combinations. Moreover, numerous colors may be associated with or used by one gang. Lunsmann agreed with defendant's counsel that 'all of the colors under the rainbow can indicate a gang in the right combination' and that 'the list is endless.' According to the officers, other examples of clothes used as gang symbols include [Oakland] Raiders caps, [Chicago] Bulls jackets and caps, Converse shoes, one untied shoelace, and caps that are tilted to the left or to the right. The officers also conceded that the list of gang symbols or jewelry also includes designs or emblems that are not necessarily gang related. According to Lunsmann, other common gang insignia include the six-pointed star, the '[f]ive-pointed star, backwards Swastika, Playboy bunny head, Spanish cross * * * [and] winged heart.' ". (*Id.* at pp. 4-5 [660 N.E.2d at pp. 261-262].)

This testimony, the court observed, showed that the "gang activity ordinance" was "directed at a wide variety of symbolic speech, much of which is not inherently gang related. The subject matter of the law's prohibitions is not merely broad, but open-ended and potentially limitless. The ordinance does not define, list, or explain what constitutes a 'gang symbol' or

*supra,* 277 Ill.App.3d 1 [660 N.E.2d 259]; *Chalifoux v. New Caney Independent School District* (S.D.Tex. 1997) 976 F.Supp. 659, 668.) But that is the least of it, as "gang colors," (as well as "offensive slogans [and] insignia") simply provides a nonexclusive example of "apparel or accessories *intended to provoke, offend or intimidate others.*" (Italics added.) These operative criteria are so highly subjective as to provide enforcement authorities almost unfettered license to decide what the dress code permits and prohibits. As appellants have neither imposed nor offered any narrowing construction of the code (see *In re Cox, supra,* 3 Cal.3d 205, 221), it is impossible to objectively determine whether the wearing of particular apparel or accessories is or would be thought by a law enforcement official to be within the ambit of its prohibitions.

*Coates v. City of Cincinnati* (1971) 402 U.S. 611 [91 S.Ct. 1686, 29 L.Ed.2d 214] involved an ordinance making it illegal for " 'three or more persons to assemble . . . on any . . . sidewalk[] . . . and there conduct themselves in a manner annoying to persons passing by.' " (*Id.* at pp. 611-612 [91 S.Ct. at p. 1687].) The Supreme Court found the ordinance vague because it was impossible to know in advance what "annoys some people [but] does not annoy others." (*Id.* at p. 614 [91 S.Ct. at p. 1688]; see also, *Kolender v. Lawson, supra,* 461 U.S. 352, 357-358 [103 S.Ct. 1855, 1858-1859] [finding the meaning of the words "credible and reliable" similarly unknowable]; *City of Chicago v. Morales* (1999) 527 U.S. 41 [119 S.Ct. 1849, 144 L.Ed.2d 67, 72 A.L.R.5th 665] [invalidating ordinance prohibiting "criminal street gang members" from "loitering" with one another or with others in a public place]; *In re Cox, supra,* 3 Cal.3d 205, 221 ["the phrase 'offensive personal conduct' is simply too vague and broad a standard for the regulation of expression or conduct intertwined with expression"]; *In re Bushman* (1970) 1 Cal.3d 767, 773 [83 Cal.Rptr. 375, 463 P.2d 727], disapproved on other grounds in *People v. Lent* (1975) 15 Cal.3d 481, 485 [124 Cal.Rptr. 905, 541 P.2d 545] [because "offensive conduct" may be constitutionally protected, an individual may be found "guilty of disturbing the peace through 'offensive' conduct [only] if by his actions he willfully and maliciously incites others to violence or engages in conduct" presenting a clear and present danger of "incit[ing] others to violence"].)

Like the ordinance in *Coates,* the dress code before us provides no "ascertainable standard for inclusion or exclusion." (*Coates v. City of Cincinnati, supra,* 402 U.S. at p. 614 [91 S.Ct. at p. 1688].) Because it is vague

'gang colors'; it does not even define 'gang.' Further Officers Lunsmann and Burton conceded that almost any color combination may become gang colors and almost any symbol may be a gang symbol; in Lunsmann's words, 'the list is endless.' What is innocent today may become a gang symbol tomorrow according to the whim of the gangs themselves. Were a gang (however defined) to adopt red, white, and blue as its colors or the crucifix as a symbol, every church and school would be 'flashing' gang symbols." (*City of Harvard v. Gaut, supra,* 277 Ill.App. at p. 7 [660 N.E.2d at p. 263], italics omitted.)

not just as applied to Gatto or a limited group of individuals, but in all possible applications, it is proper to call it "perfectly vague." (*Ibid.*; for an example of a restriction that might only be "vague as applied" see *Parker v. Levy* (1974) 417 U.S. 733 [94 S.Ct. 2547, 41 L.Ed.2d 439] [" 'conduct unbecoming an officer and a gentleman' "].)

The vagueness of the dress code is largely the reason it is also impermissibly overbroad. ▆▆▆ A statute or regulation is overbroad if it "does not aim specifically at evils within the allowable area of [governmental] control, but . . . sweeps within its ambit other activities that in ordinary circumstances constitute an exercise" of protected expression and conduct. (*Thornhill v. State of Alabama* (1940) 310 U.S. 88, 97 [60 S.Ct. 736, 742, 84 L.Ed. 1093].) ▆▆▆ Appellants' dress code fits this description. A great deal of the apparel and accessories celebrated in contemporary fashion magazines can fairly be described as provocative and/or intimidating; and conventional dress bearing forms of political speech and religious expression protected under the First Amendment are clearly offensive to many people, and sometimes even likely to provoke violence. (See, e.g., *Cohen v. California* (1971) 403 U.S. 15 [91 S.Ct. 1780, 29 L.Ed.2d 284] [T-shirt bearing slogan " 'Fuck the Draft' "]; *Collin v. Smith, supra,* 578 F.2d 1197 [Nazi Party uniforms and insignia]; *Hernandez v. Superintendent, supra,* 800 F.Supp. 1344 [Ku Klux Klan regalia]; *Chalifoux v. New Caney Independent School District, supra,* 976 F.Supp. 659 [wearing rosaries as necklaces].)

The desire of operators of a county fair or other enterprise providing family entertainment to the public to prohibit patrons from wearing clothing widely believed to be offensive is understandable. But even a clear and narrowly drawn restriction of many forms of behavior offensive to most people may be hard to reconcile with the values enshrined in the First Amendment. *Cohen v. California, supra,* 403 U.S. 15 explains why. The Supreme Court held in that case that the phrase "fuck the draft," though clearly offensive to many people, was nevertheless protected by the First Amendment when portrayed on a jacket worn in a courthouse corridor. As stated by the court, "[h]ow is one to distinguish this from any other offensive word? Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. Yet no readily ascertainable general principle exists for stopping short of that result were we to affirm the judgment below. For while the particular four-letter word being litigated here is perhaps more distasteful than most other of its genre, it is nevertheless often true that one man's vulgarity is another's lyric." (*Id.* at p. 25 [91 S.Ct. at p. 1788].)

As our own Supreme Court has noted, *Cohen v. California,* and cases vacating criminal convictions for the use of offensive speech (*Brown v.*

*Oklahoma* (1972) 408 U.S. 914 [92 S.Ct. 2507, 33 L.Ed.2d 326]; *Lewis v. City of New Orleans* (1972) 408 U.S. 913 [92 S.Ct. 2499, 33 L.Ed.2d 321]), illustrate both the use of offensive speech "in sections of our multifarious society" and the increasing immunity from sanction of such expressions. (*Lindros v. Governing Bd. of the Torrance Unified School Dist.* (1973) 9 Cal.3d 524, 537 [108 Cal.Rptr. 185, 510 P.2d 361]; see also *In re Cox, supra,* 3 Cal.3d 205, 221.) ▮ " 'The First Amendment forbids the government to silence speech based on the reaction of a hostile audience, unless there is a 'clear and present danger' of grave and imminent harm. [Citations.] Otherwise, a vocal minority (or even majority) could prevent the expression of disfavored viewpoints—a result contrary to the central purpose of the First Amendment's guarantee of free expression. [Citations.] [¶] These constitutional principles mandate that government may not disadvantage a person on the basis of his status or his views solely for fear that others may be offended or angered by them. . . . The Constitution does not allow government to subordinate a class of persons simply because others do not like them.' [Citation.] ' "[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise" [Citation.]' (*Cox v. Louisiana* (1965) 379 U.S. 536, 551 [85 S.Ct. 453, 462, 13 L.Ed.2d 471]." (*San Diego Unified Port Dist. v. U.S. Citizens Patrol, supra,* 63 Cal.App.4th 964, 970, quoting *Steffan v. Aspin* (D.C. Cir. 1993) 8 F.3d 57, 68-69; see also *In re Bushman, supra,* 1 Cal.3d 767, 773-774.)

▮ While the operators of a county fair or like public event cannot proscribe the wearing of clothing thought likely to be offensive to others, they can employ dress codes to prohibit not only indecent exposure proscribed by law (see, e.g., Pen. Code, § 314), but also the wearing of clearly specified types of clothing or accessories they reasonably believe might lead to substantial disruption of or material interference with the event. (See *Jeglin v. San Jacinto Unified School Dist., supra,* 827 F.Supp. 1459, 1461.) For example, if appellants knew, and could show, that the wearing of distinctive insignia unique to a discernible group was reasonably likely to provoke violence at the Fair, persons wearing that insignia could be excluded; appellants would not have to wait for the expected violence to materialize. But that is not what happened in this case. Appellants did not prohibit the wearing of Hell's Angels insignia (or the insignia or symbols of any other specific group), and there is no showing that the wearing of such an insignia was likely to lead to violence.

The trial court's conclusion that appellants' dress code was unconstitutional was correct.

### DISPOSITION

For the foregoing reasons, the portion of the judgment finding that appellants denied Gatto free and equal access to the Fair in violation of the

Unruh Civil Rights Act is reversed. In all other respects the judgment is affirmed, as is the award of attorney fees, the amount of which is unchallenged. Respondent shall receive his costs on appeal.

Lambden, J., and Ruvolo, J., concurred.