**Patrice L. GOLDMAN, individually and on behalf of others similarly situated, Plaintiff–Appellant,**

v.

**STANDARD INSURANCE COMPANY, Defendant–Appellee.**

No. 00–16691.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 12, 2001.

Submission Withdrawn Nov. 21, 2001.

Resubmitted March 17, 2003.

Filed Aug. 29, 2003.

Claudia Center and William C. McNeill, III, The Employment Law Center, a Project of The Legal Aid Society of San Francisco, San Francisco, CA, for the plaintiff-appellant.

Shawn Hanson and Katherine S. Ritchey, Pillsbury Winthrop LLP, San Francisco, CA, for the defendant-appellee.

Before W. FLETCHER, FISHER and TALLMAN,[*] Circuit Judges.

FISHER, Circuit Judge:

In 1996, appellant Patrice Goldman, an attorney, applied for a disability income insurance policy with appellee Standard Insurance Company ("Standard") through a program approved by the State Bar of California and available only to its members. Standard declined to issue Goldman a policy, because she had been diagnosed as having an "Adjustment Disorder with mixed anxiety and depressed mood, DSM IV (Diagnostic and Statistical Manual of Mental Disorders) 309.28," and was participating in weekly therapy sessions with a licensed clinical social worker.[1] Standard's underwriting policy is to deny coverage for applicants with adjustment disorder until at least one year after the cessation of treatment.

Goldman initially filed suit in federal district court seeking damages and declaratory and injunctive relief for violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; California's Unruh Civil Rights Act, California Civil Code section 51 ("Unruh Act"); and California Business and Professions Code section 17200 et seq., but shortly thereafter she dismissed her federal complaint and filed the same claims in California state

---

[*] Judge Tallman was drawn to replace Judge Henry Politz. Judge Tallman has read the briefs, reviewed the record, and listened to the tape of oral argument held on September 12, 2001.

1. Adjustment disorder is a short-term condition that occurs when a person is unable to cope with a particular source of stress. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 679–80 (4th ed.2000). The distress is in excess of that which would be expected to result from the stressor and causes a significant impairment in social or occupational functioning. Id. The type of adjustment disorder from which Goldman suffers manifests itself in a combination of depressed and anxious feelings.

court. Standard, however, removed the case to federal court on March 13, 1998. The district court exercised its jurisdiction under 28 U.S.C. § 1331 based on the ADA claim, and its supplemental jurisdiction over the state law claims.

In December 1999, the district court granted summary judgment against Goldman. The court found that Goldman could not qualify as a disabled person under the ADA, because Standard did not regard her as *presently* substantially limited by her adjustment disorder but only as a person who *may* be substantially limited in the future. In so holding, the court relied upon the United States Supreme Court's interpretation of the ADA in *Sutton v. United Air Lines,* 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), requiring a plaintiff to show she is "presently—not potentially or hypothetically—substantially limited." *Id.* The district court concluded that the Unruh Act incorporated the ADA definition of disability and thus Goldman also was not covered by the Unruh Act. Finally, the court rejected Goldman's claim under section 17200. Goldman appeals the entry of summary judgment on her claims under the Unruh Act and section 17200, but does not pursue her ADA claim.[2] We conclude that unlike the ADA as interpreted by *Sutton,* the definition of disability under the Unruh Act does not require a plaintiff to show that she is regarded as having a *present* limitation of a major life activity.[3] As the California Legislature recently clarified, this was the state of California law in 1997, when Standard refused to issue

Goldman a policy, and it remains the law today. We thus reverse the summary judgment on Goldman's claim under the Unruh Act and under section 17200.

## Discussion

### I.

### Standard of Review

 We "review de novo a grant of summary judgment and must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Roach v. Mail Handlers Benefit Plan,* 298 F.3d 847, 849 (9th Cir.2002) (internal quotations and citation omitted). A district court's interpretation of state law is reviewed de novo. *Paulson v. City of San Diego,* 294 F.3d 1124, 1128 (9th Cir.2002) (en banc). We must determine what meaning the state's highest court would give the statute in question. *Id.*

### II.

### Goldman's Unruh Civil Rights Act claim

The Unruh Act provides:

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, *disability,* or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all

---

**2.** Because Goldman does not appeal her ADA claim, we do not address the propriety of the district court's ruling that Goldman failed to satisfy the definition of disability under the ADA's "regarded as" prong, 42 U.S.C. § 12102(2)(C).

**3.** We are not concerned with whether or not the Unruh Act requires the limitation to be

substantial. Standard regards Goldman as having a condition that may completely prohibit her from performing her job and thus as having a condition that may substantially limit her ability to work, which we assume, absent argument to the contrary, is a major life activity under pre–2000 California law.

business establishments of every kind whatsoever.

Cal. Civ.Code § 51(b) (West 2003) (emphasis added). "The Unruh Civil Rights Act works to ensure that all persons receive the full accommodations of any business within California, regardless of the person's disabilities." *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1050(9th Cir.2000) (holding that the Unruh Act prohibits an insurance company from imposing unreasonable pricing differentials based on an applicant's disability).

Goldman alleges that Standard refused to issue her insurance coverage solely on the basis of her diagnosis of adjustment disorder. The Unruh Act applies to insurance companies, *see* Cal. Ins.Code § 1861.03(a) (West 2003), and an insurance company's refusal to provide coverage on the basis of disability may constitute a denial of "full and equal ... services" if the discrimination is not reasonable. *See Chabner*, 225 F.3d at 1050("disparities in treatment and pricing that are reasonable do not violate the . Unruh Act") (citing *Koire v. Metro Car Wash*, 40 Cal.3d 24, 219 Cal.Rptr. 133, 707 P.2d 195 (1985)). Thus, if Goldman's adjustment disorder

constitutes a disability within the meaning of the Unruh Act, then the Act may provide relief against Standard's refusal to issue a policy.

## A. Goldman is disabled for the purposes of the Unruh Act.

■ To survive summary judgment, Goldman must first demonstrate a triable issue of fact as to whether she has a "disability" within the meaning of the Unruh Act. Thus we must determine what constitutes a disability for purposes of that Act. In 1997, when Standard refused to issue a policy to Goldman, the Act did not define the term "disability."[4] In 2000, however, the California Legislature enacted the Poppink Act, which amended the Unruh Act to define the term as any mental or physical disability covered by the Fair Employment and Housing Act ("FEHA"), California Government Code section 12920 *et seq.* Cal. Civ.Code § 51(e)(1)(West 2003); *see* 2000 Cal. Stat. Ch. 1049 (Assembly Bill 2222, Sec. 2). FEHA includes within the definition of "mental disability" two subsections that are relevant here:

**4.** We are aware that the pre–2000 version of California Civil Code § 54 contained a definition of "disability," which incorporated the language used in the ADA definition of the term, and that courts and commentators have sometimes referred to § 54 of the Civil Code as part of the Unruh Act. *See, e.g., Molski v. Gleich*, 318 F.3d 937, 944–45 (9th Cir.2003); *Botosan v. Paul McNally Realty*, 216 F.3d 827, 835 n. 3 (9th Cir.2000); *Colmenares v. Braemar Country Club, Inc.*, 29 Cal.4th 1019, 1025–26, 1027–28, 130 Cal.Rptr.2d 662, 63 P.3d 220 (2003); *Donald v. Sacramento Valley Bank*, 209 Cal.App.3d 1183, 1185–86, 260 Cal.Rptr. 49 (1989). However, the California Court of Appeal has explained that only § 51 truly comprises the Unruh Act and that courts should not permit the inclusion of other Civil Code sections as nominally part of the Unruh Act to obscure legally significant differences

between the statutes. *Gatto v. County of Sonoma*, 98 Cal.App.4th 744, 757–58, 120 Cal. Rptr.2d 550 (2002) (discussing different statutes of limitations applicable to various Civil Code sections sometimes termed as part of the Unruh Act); *cf. Hankins v. El Torito Rests., Inc.*, 63 Cal.App.4th 510, 517, 520 n. 4, 74 Cal.Rptr.2d 684 (1998) (noting that unlike a § 51 claim, § 54 does not require intent); *see also* Cal. Dep't of Fair Employment & Hous., General Information about the Unruh Civil Rights Act, *at* http://www.dfeh.ca.gov/Publications/DFEH 250.pdf (last visited July 29, 2003) (explaining the Unruh Act is codified at Civil Code §§ 51 through 51.3). This comports with the fact that the definition of "disability" in § 54 is applicable to statutes in Part 2.5 of the Civil Code, Cal. Civ.Code § 54(b) (West 1997), whereas § 51 is in Part 2. To avoid any confu-

(1) Having any mental or psychological disorder or condition, such as mental retardation, organic brain syndrome, emotional or mental illness, or specific learning disabilities, that limits a major life activity.

. . .

(5) Being regarded or treated by the employer or other entity covered by this part as having, or having had, a mental or psychological disorder or condition that *has no present disabling effect, but that may become a mental disability* as described in paragraph (1) or (2).

Cal. Gov't Code § 12926(i)(1), (5) (West 2003) (emphasis added).

Through the help of therapy, Goldman functions effectively in her daily life and occupation as an attorney. She is not presently limited in any major life activity and—given sub-section (5) of California Government Code § 12926(i), which directly addresses a future disability—does not appear to be covered by subsection (1). Standard, however, believes that Goldman may someday be entirely prohibited from working given her diagnosis of adjustment disorder. This belief was the basis of Standard's refusal to issue Goldman a disability insurance policy. Thus, assuming

the definition of disability in the 2000 amendment is applicable to Goldman, either because the amendments were intended to apply retroactively or because they merely clarified existing law, Goldman would be regarded as disabled under subsection (5) of the definition. *Id.* § 12926(i)(5).[5]

Standard contends that the 2000 amendments were not intended to apply retrospectively and that the amendments constituted a change rather than a clarification of existing law under the Unruh Act. According to Standard, the 1997 version of the Unruh Act incorporated the ADA definition of "disability," and thus the Supreme Court's interpretation of the ADA as requiring a person to be presently limited in a major life function must apply to the Unruh Act as well. *See Sutton,* 527 U.S. at 482, 119 S.Ct. 2139. Because it considered Goldman to be potentially but not presently limited by her condition, Standard argues that in 1997, Goldman did not come within the disability antidiscrimination protections of the Unruh Act.

■ The parties have argued extensively as to the retroactive application of the 2000 amendments. In the absence of an

---

sion, all references to the Unruh Act in this opinion mean California Civil Code § 51.

**5.** Goldman alternatively argues that the pre–2000 Unruh Act shares the definition of "mental disability" in the pre–2000 version of FEHA, which, unlike FEHA's definition of "physical disability," did not require that a mental disability have *any* limiting effect, present or future. *See Jensen v. Wells Fargo Bank,* 85 Cal.App.4th 245, 257, 102 Cal. Rptr.2d 55 (2000); *Pensinger v. Bowsmith, Inc.,* 60 Cal.App.4th 709, 721–22, 70 Cal. Rptr.2d 531 (1998). *But see Muller v. Auto. Club,* 61 Cal.App.4th 431, 441–43, 71 Cal. Rptr.2d 573 (1998) (mental disability requires substantial limitation of major life activity). Standard not only disagrees that this FEHA definition applies, but argues the question is foreclosed by the California Supreme Court's

recent decision in *Colmenares,* where the court noted that certain non-FEHA statutes, including "the Unruh Act," had incorporated the ADA's definition of "disability." 29 Cal.4th at 1025–27, 130 Cal.Rptr.2d 662, 63 P.3d 220 (citing § 54 as the "Unruh Act"). Thus, argues Standard, the pre–2000 FEHA definition cannot be the same as that under the Unruh Act.

It is neither prudent nor necessary for us to decide whether *Colmenares'* reference to the Unruh Act embraced § 51, the section under which Goldman's claim arises, or whether it meant only to refer to § 54 *et seq.* As discussed at note 4 *supra,* the term Unruh Act has commonly been used in referring to § 54. Instead, we assume *arguendo* the pre–2000 version of the Unruh Act's definition of "mental disability" required a limitation of a major life function.

express retroactivity provision, California legislation is presumed to operate prospectively "unless it is very clear from extrinsic sources that the Legislature or the voters must have intended a retroactive application." *In re Eastport Assocs.*, 935 F.2d 1071, 1079 (9th Cir.1991) (quoting *Evangelatos v. Superior Court*, 44 Cal.3d 1188, 1209, 246 Cal.Rptr. 629, 753 P.2d 585 (1988)). While Goldman's appeal was pending before us, the California Supreme Court took for review a case that raised the issue of whether the 2000 amendments were intended to apply retroactively. *Colmenares v. Braemar Country Club, Inc.*, 29 Cal.4th 1019, 1024 n. 2, 130 Cal.Rptr.2d 662, 63 P.3d 220 (2003).[6] Accordingly, we withdrew submission of Goldman's case pending a decision in *Colmenares*. Rather than reaching the retroactivity question, however, the California Supreme Court concluded that the 2000 amendments merely clarified, rather than changed, the existing law that was relevant to the specific claims involved in that case. *Id.* at 1024 n. 2, 1030–31, 130 Cal.Rptr.2d 662, 63 P.3d 220(noting, in construing whether FEHA required a limitation be substantial, that a legislative act that merely clarifies the law has no retrospective effect because the true meaning of the statute remains the same).

For similar reasons, and guided by *Colmenares*, we likewise do not need to resolve the retroactive application of the Poppink Act generally, because we are persuaded that California's disability antidiscrimination law has never required that a plaintiff be regarded as *presently* limited by her disability. The 2000 amendments, although making other changes to the existing definition of disability under Califor-

nia law, merely clarified that the definition does not include such a limitation nor has it ever done so.

■ Courts are not to infer that legislation merely clarifies existing law unless (1) the nature of the amendment clearly demonstrates such an intent or (2) the legislature has itself stated that the particular amendment is merely declaratory of existing law. *Victoria Groves Five v. Chaffey Joint Union High Sch. Dist.*, 225 Cal. App.3d 1548, 1555, 276 Cal.Rptr. 14 (1990). Both indicia are present here.

*1. Nature of the Amendment—The Unruh Act Before 2000*

In ascertaining the intent of the California Legislature, it is instructive to look to the pre–2000 understanding of disability in the context of the Unruh Act as section 51 has evolved. The Unruh Act was enacted in 1959 to broaden the prior version of California Civil Code section 51 to provide full and equal public accommodations regardless of race, color, religion, ancestry or national origin. *Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142, 1151–52, 278 Cal.Rptr. 614, 805 P.2d 873 (1991). In 1987, the Legislature added "blindness or other physical disability" to the list of protected classifications. *Id.* at 1153, 278 Cal.Rptr. 614, 805 P.2d 873. This amendment brought the Unruh Act into accord with California Civil Code section 54 *et seq.*, which entitled "[b]lind persons, visually handicapped persons, deaf persons, and other physically disabled persons" to full and equal access to common carriers, places of public accommodation, telephone facilities and other enumerated services, *see* Cal. Civ.Code § 54.1(West

---

**6.** In addition to granting review of *Colmenares*, previously published at 89 Cal.App.4th 778, 107 Cal.Rptr.2d 719 (2001), which had held that the Poppink Act modified existing law to a standard that is broader than the ADA, the California Supreme Court granted review of *Wittkopf v. County of Los Angeles*, previously published at 90 Cal.App.4th 1205, 109 Cal.Rptr.2d 543 (2001), which had come to the opposite conclusion.

1987), and with FEHA, which prohibited employment discrimination based on "physical handicap." *Colmenares*, 29 Cal.4th at 1024–25, 130 Cal.Rptr.2d 662, 63 P.3d 220. In the version of FEHA in effect from 1980 through 1992, "physical handicap" was defined to include "impairment of sight, hearing, or speech, or impairment of physical ability." *Id.* (internal quotations omitted). Rather than defining the term "impairment" as used in FEHA, the Fair Employment and Housing Commission adopted a regulation, drawn from the federal Rehabilitation Act of 1973, which defined "physical handicap" as a condition that "substantially limits one or more major life activities." *Id.* at 1025, 130 Cal.Rptr.2d 662, 63 P.3d 220 (quoting former Cal. Admin. Code tit. 2, § 7293.6, subd. (j)(1)).

In 1990, Congress enacted the ADA, which defined the term "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Two years later, the California Legislature amended the Unruh Act, Civil Code section 54 and FEHA to expand coverage in light of the ADA. The Unruh Act's terminology, "blindness and physical disability," was changed to simply "disability," which was not defined. The Unruh Act was, however, amended so that "[a] violation of the right of any individual under the Americans with Disabilities Act (Public Law 101–336) shall also constitute a violation of this section." Cal. Civ.Code § 51 (West 1993). The Legislature added

this reference to the ADA in order "to strengthen California law in this area [i.e., disability rights] where it is weaker than the Americans with Disabilities Act of 1990 ... and to retain California law when it provides more protection for individuals with disabilities than the [ADA]." *Gatto*, 98 Cal.App.4th at 758–59, 120 Cal.Rptr.2d 550 (quoting Assemb. Bill No. 1077, ch. 913, § 1, 1992 Cal. Stat. 4282). Section 54's definition of "physical and mental disability" and FEHA's definition of "physical disability," on the other hand, were given statutory definitions generally modeled on the language of the ADA definition. *Colmenares*, 29 Cal.4th at 1025–26, 130 Cal.Rptr.2d 662, 63 P.3d 220. Of particular importance here, both section 54 and FEHA required that the impairment *"limits"* participation in major life activities, the same language used in the ADA and in the California regulations implementing the prior version of FEHA.[7]

In 1999, the United States Supreme Court held that "a person [must] be *presently*—not potentially or hypothetically—substantially limited in order to demonstrate a disability" within the meaning of the ADA. *Sutton*, 527 U.S. at 482, 119 S.Ct. 2139 (emphasis added). This conclusion turned largely on the fact that "the phrase 'substantially *limits*' appears in the Act in the present indicative verb form." *Id.* (emphasis added). The definition of "physical disability" employed in FEHA and of "mental and physical disability" in California Civil Code section 54 also use the present indicative verb form, "limits." We assume *arguendo* that the definition of

---

**7.** Although both were modeled on the ADA's definition, § 54 differed from FEHA in that the former, like the ADA itself, required the limitation to be substantial. Section 54 defined "disability" as an "impairment that *substantially limits* one or more of the major life activities of the individual." *Compare* Cal. Civ.Code § 54(b)(1) (West 1997) (defining

"disability" as an "impairment that *substantially limits* one or more of the major life activities of the individual"), *with* Cal. Gov't Code § 12926(k)(1)(B) (West 1997) (defining "physical disability" as a condition that *"limits* an individual's ability to participate in major life activities").

mental disability for purposes of the Unruh Act pre–2000 would also have been expressed using "limits" in the present indicative. We cannot, however, take the next step Standard urges: that the verb form compels reading the Unruh Act in the restrictive manner *Sutton* read the ADA. To do so would fly in the face of the California Legislature's clearly expressed intent that the Unruh Act's antidiscrimination provisions be read broadly, and that it looked to the ADA as a model for putting a floor on coverage for the disabled, not a cap on liability.

First, when it adopted the "limits" terminology of the ADA, the Legislature also specified that, for purposes of FEHA:

> It is the intent of the Legislature that the definition of "physical disability" in this subdivision shall have the *same meaning as* the term "physical handicap" formerly defined by this subsection and construed in *American National Ins. Co. v. Fair Employment & Housing Com.*, 32 Cal.3d 603, 186 Cal.Rptr. 345, 651 P.2d 1151.

Cal. Gov't Code § 12926(k)(4) (West 1997) (emphasis added); *see also Cassista v. Cmty. Foods, Inc.*, 5 Cal.4th 1050, 1059, 22 Cal.Rptr.2d 287, 856 P.2d 1143 (1993) (discussing the legislative intent to maintain continuity of the definition). In *American*

*National*, the California Supreme Court interpreted the term "physical handicap" as used in the pre–1992 version of FEHA broadly and, among other things, held that the term included physical conditions "that *may handicap in the future but have no presently disabling effect.*" *Am. Nat'l Ins. Co. v. Fair Employment and Hous. Comm'n*, 32 Cal.3d 603, 610, 186 Cal.Rptr. 345, 651 P.2d 1151 (1982) (emphasis added).[8]

By adopting *American National's* interpretation, the California Legislature made clear that it did not understand the term "limits" in the 1992 version of FEHA to imply a requirement of present disability, contrary to the Supreme Court's later interpretation of the same term in the ADA in *Sutton*. The same 1992 act that incorporated the limits language into FEHA also did so for section 54, albeit further requiring that the limitation be substantial. Given the clear legislative understanding of the term "limits" in FEHA as being consistent with *American National's* holding that a presently disabling condition was not necessary, we must assume—absent compelling evidence otherwise—that the California Legislature did not intend a different understanding of that term in other sections that were amended by the same legislation.[9] Thus, whether construing FEHA's or Civil Code section 54's use

---

**8.** The version of FEHA in effect at the time *American National Insurance Co.* was decided in 1982 did not use the "limits" terminology. Rather, it defined "physical handicap" to include an "(1) impairment of sight, hearing or speech, or (2) impairment of physical ability because of amputation or loss of function or coordination." *Am. Nat'l Ins. Co.*, 32 Cal.3d at 608, 186 Cal.Rptr. 345, 651 P.2d 1151.

**9.** Relying on *Harris,* 52 Cal.3d at 1173–1174, 278 Cal.Rptr. 614, 805 P.2d 873, Standard contends that the California Supreme Court has expressly disapproved an analogy between FEHA and the Unruh Act. In that case, the court refused to apply FEHA's disparate impact test to the Unruh Act. In doing so, it

stated that "the *general* antidiscriminatory objectives of the Unruh Act are much broader than the *specific* antidiscrimination principles underlying titles VII and VIII ... [and] their state FEHA counterparts." *Id.* at 1174, 278 Cal.Rptr. 614, 805 P.2d 873 (internal quotation marks omitted). This language does not foreclose our analysis that the two statutes use the same definition of the term "limits." While application of the disparate impact model—a new *type* of liability—to the Unruh Act would expose all businesses to "new liability and potential court regulation of their day-to-day practices," *id.*, no such consequence flows from application of FEHA's definition of the term "limits" across the California statutes amended by the same 1992 Act.

of the word "limits" or the Unruh Act's implied incorporation of that terminology as of 1997, we should assume that a plaintiff would have been considered disabled if she was regarded as having a disability that might limit a major life activity in the future.

The 2000 amendments therefore did not alter, but merely clarified, that California's disability antidiscrimination statutes—although historically modeled on the ADA—are broader than federal law, as it came to be interpreted by the Supreme Court in *Sutton* in 1999. This conclusion is reinforced by the California Legislature's own declaration enacted in 2000 as part of the Poppink Act and by that Act's legislative history.

### 2. Legislative Statement that the 2000 Amendment was Merely Declaratory of Existing Law

■ In the Poppink Act the Legislature declared that:

> The law of this state in the area of disabilities provides protections independent from those in the federal Americans with Disabilities Act of 1990 (Public Law 101–336). Although the federal act provides a floor of protection, *this state's law has always, even prior to passage of the federal act, afforded additional protections.*

10. Standard notes that a prior version of the Poppink Act contained legislative findings that specifically stated:

> The Legislature declares that the amendments made by this act to subdivisions (h), (i), and (k) of Section 12926 of the Government Code and Sections 51, 51.5, and 54 of the Civil Code are declaratory of existing state law.

*See* Assembly Bill No. 2222 § 1.5, 1999–2000 Reg. Sess., at 2 (as amended on May 26, 2000). On July 6, 2000, the bill was amended to delete these findings and to replace them with those now codified at California Government Code § 12926.1. *See* Assembly Bill No. 2222, 1999–2000 Reg. Sess., at 3 (as amended

Cal. Gov't Code § 12926.1(a) (emphasis added). This statement appears to be at least in part a reference to the California Supreme Court's decision in *American National,* which preceded the enactment of the ADA by eight years. For instance, the Report of the Assembly Committee on the Judiciary specifically noted that the incorporation by the Poppink Act of *American National*'s interpretation of FEHA into California Government Code section 12926(k)(4) reflected that California law has always been different from the ADA as interpreted in *Sutton.*[10] *See* Assembly Comm. on Judiciary, Bill Analysis of Assembly Bill No. 2222, 1999–2000 Reg. Sess., at 4–5 (Apr. 11, 2000) (noting that *American National* is contrary to *Sutton* and that "the more restrictive ADA definition, as recently construed by the U.S. Supreme Court, should not . . . be allowed to preclude a finding that a person is disabled under FEHA"). Moreover, this declaration echoes the intent of the California Legislature in 1992 "to strengthen California law in this area . . . where it is weaker than the Americans with Disabilities Act of 1990 . . . and *to retain California law when it provides more protection for individuals with disabilities than the [ADA]." Gatto,* 98 Cal.App.4th at 759, 120 Cal.Rptr.2d 550 (quoting Assemb. Bill No. 1077, ch. 913, § 1, 1992 Cal. Stat. 4282) (emphasis added).[11] "[A]lthough construc-

on July 6, 2000). This substitution does not help Standard, however. The declaration that was enacted continues to note the historical distinction between the ADA and California law. Moreover, unlike the original draft, the enacted declaration recognizes that the amendments clarified some aspects of the law while changing others. Thus, § 12926.1 appears to be a more narrowly tailored declaration of the clarification of existing law.

11. Our understanding of § 12926.1 as declaratory of existing law is supported by the California Supreme Court's decision in *Colmenares.* The lower court's decisions in *Colmenares,* previously published at 89 Cal.

tion of a statute is a judicial function, where a statute is unclear, a subsequent expression of the Legislature bearing upon the intent of the prior statute may be properly considered in determining the effect and meaning of the prior statute." *Tyler v. State*, 134 Cal.App.3d 973, 977, 185 Cal.Rptr. 49 (1982).

Nonetheless, Standard contends the legislative history of the Poppink Act shows that it modified existing law and was not intended merely as a clarification. It notes two press releases from the bill's author, then Assembly Member Sheila James Kuehl, which state that the Poppink Act was "designed to strengthen the rights of workers with disabilities." Standard also relies on the report of the Assembly Committee on Appropriations, which stated that the bill:

> *Modifies* and standardizes the definitions of "mental disability," "physical disability" and "medical condition" for purposes of California's Unruh Civil Rights Act and Fair Employment and Housing Act (FEHA) and *to clarify* that California's disability protections are broader than federal protections under the Americans with Disabilities Act (ADA).

Assembly Comm. on Appropriations, Bill Analysis of Assembly Bill No. 2222, 1999–2000 Reg. Sess., at 1–2 (May 17, 2000) (emphasis added). These statements do not alter our conclusion; they simply show

that the legislation modified the law in part and clarified it in part.

First, Standard's argument ignores statements of the intent to clarify contained in these same sources. Second, the California Supreme Court, in *Colmenares*, specifically held that parts of the Poppink Act were intended to clarify rather than to modify existing law. *Colmenares*, 29 Cal.4th at 1030–31, 130 Cal.Rptr.2d 662, 63 P.3d 220. Finally, we find no anomaly in legislative statements that the Poppink Act was designed both to modify *and* to clarify. Clearly, the amendments did both. For instance, the Poppink Act modified the definition of "disability" in section 54 to delete the requirement that a limitation be substantial. *Compare* Cal. Civ.Code § 54(b) (West 1997), *with* Cal. Civ.Code § 54(b) (West 2003) (incorporating the definition enacted by the Poppink Act and found in Cal. Gov't Code § 12926). The Poppink Act both modified and clarified FEHA, first by adding the "limits" language to the definition of "mental disability," then by clarifying that FEHA—past or present—did not require that a limitation be substantial. *Compare* Cal. Gov't Code § 12926(i) (West 1997) (no limits language for mental disability), *with* Cal. Gov't Code § 12926(i)(1) (West 2003) (adding limits language). Thus, it is not surprising that the Legislature would have referred to both modification and clarification.

App.4th 778, 781–84, 107 Cal.Rptr.2d 719 (2001), read § 12926.1 as indicating a modification. In coming to this conclusion, it emphasized a few select words in the declaration that it believed demonstrated the statute "tells us not what the law already says but that, in a time yet to come, the statute is intended *to result in* broader coverage." *Id.* at 781–83, 107 Cal.Rptr.2d 719 (relying on the words "to result in" in subsection (c) and "to require" and "to provide" in subsection (d)). On the other hand, in *Wittkopf v. Coun-*

*ty of Los Angeles*, previously published at 90 Cal.App.4th 1205, 1215–17, 109 Cal.Rptr.2d 543 (2001), Justice Boland interpreted § 12926.1 as a declaration of existing law, noting as we do that the section begins by stating that California disability antidiscrimination law has always been broader than the ADA. In reversing *Colmenares* and upholding *Wittkopf*, the California Supreme Court clearly expressed its preference for Justice Boland's analysis.

Moreover, the intent to clarify that California disability antidiscrimination law is broader than that of the ADA is evident throughout the legislative history of the Poppink Act. The Assembly Committee on the Judiciary framed the "key issue" as whether "the definition of mental and physical disability and medical condition [should] be clarified in California's civil rights laws," Assembly Comm. on Judiciary, Bill Analysis of Assembly Bill No. 2222, 1999–2000 Reg. Sess., at 1 (Apr. 11, 2000), and specifically stated that the bill would "*clarify* the definition" of disability in the Unruh Act, which had previously "had no definition at all." *Id.* at 5(emphasis added). Additionally, the California Supreme Court in *Colmenares* emphasized that certain changes to the Unruh Act were made to "*clarify* [ ] that California's disability protections are broader than federal protections." 29 Cal.4th at 1027, 130 Cal. Rptr.2d 662, 63 P.3d 220(emphasis in original).

Only one piece of legislative history counsels against our interpretation. The Report of the Senate Judiciary Committee cast the bill as one which "make[s] various definitional changes to the existing civil rights laws" and that "[t]he greatest change" is the definition of "limitation," which is to be determined without regard to mitigating measures. Senate Comm. on Judiciary, Bill Analysis of Assembly Bill No. 2222, 1999–2000 Reg. Sess., at 1 (Aug. 8, 2000).

■ Despite this one statement, we are persuaded that existing law as relevant here was merely clarified and that California law has not required that a plaintiff be regarded as having a presently limiting condition. This intent is evident in the wealth of legislative statements, the declaration contained in California Government Code section 12926.1, the California Supreme Court's decision in *Colmenares* and our own review of California law as it

existed before the 2000 amendments. Because Goldman established that Standard refused to insure her based on a mental condition that has no present disabling effect, but that may become a mental disability that will substantially limit Goldman's ability to engage in a major life function, she has established that she was "disabled" in 1997 within the meaning of the Unruh Act.

**B. Goldman presents a genuine issue of material fact as to the reasonableness of Standard's decision to deny her coverage.**

■ Standard might still be entitled to summary judgment if its decision to deny Goldman insurance coverage because of her assumed disability was reasonable as a matter of law. We have held that California Insurance Code section 10144 establishes the standard for assessing the reasonableness of a non-standard insurance premium, prohibiting any insurer from refusing insurance "solely because of a physical or mental impairment," except where the refusal "is based on sound actuarial principles or is related to actual and reasonably anticipated experience." *Chabner*, 225 F.3d at 1050(quoting Cal. Ins.Code § 10144).

Viewing the facts most favorably to Goldman as the nonmoving party, we conclude that Standard has not established as a matter of law that its decision to refuse coverage to Goldman was "based on sound actuarial principles" or "related to actual and reasonably anticipated experience." Goldman has presented sufficient evidence to create triable issues of fact regarding both prongs of the section 10144 standard. In assessing Goldman's proffered evidence, our role is not to "weigh the evidence [or] determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Suzuki Motor Corp. v. Con-*

*sumers Union of U.S., Inc.,* 330 F.3d 1110, 1140 (9th Cir.2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

First, Goldman's actuarial expert, Charles C. DeWeese, examined Standard's underwriting policy regarding adjustment disorder and concluded in his expert witness report that Standard's policy as well as its application to Goldman was inconsistent with principles of risk classification embodied in Actuarial Standard of Practice No. 12. DeWeese's expert opinion thus creates a triable issue whether Standard's refusal of coverage was "based on sound actuarial principles," section 10144's first prong.

Second, Goldman presented evidence to refute Standard's fundamental thesis relating to section 10144's second prong—that a diagnosis of adjustment disorder may predict future disability. Goldman's experts challenged this proposition on the basis of medical data, actuarial principles and actual experience.

According to Goldman's expert, Gary S. Sachs, M.D., nothing in his clinical experience, research or the professional literature suggests that employed individuals with a current diagnosis of adjustment disorder are more likely than other individuals to become subsequently disabled from working for any non-psychiatric or psychiatric reason. Dr. Sachs specifically contradicted the declarations of Standard's own actuarial and underwriting experts. Similarly, Goldman's actuarial expert, DeWeese, stated that no "credible publicly available actuarial data, studies, or other objective evidence," including Standard's own studies, "support the proposition that working individuals with adjustment disorder and/or receiving mental health counseling are at a higher risk than other individuals to subsequently become disabled from working."

Both of these experts' opinions directly challenged the validity of Standard's studies. They criticized Standard for grouping together all individuals with psychiatric conditions or receiving medical health services as posing a similar risk of subsequent disability from working. The experts explained that such a grouping was not supported by medical data, reported claims experience or sound actuarial principles of risk classification. Dr. Sachs claimed that "better predictors of whether an individual will or will not subsequently become disabled from working are their personal work history, response to treatment, compliance with treatment, persistence of severe symptoms, prolonged periods of remission during treatment, and an absence of alcohol and substance abuse." DeWeese echoed the sentiment, stating that actuarial literature also recognized "an individual's work history and their motivation to work" as a "critical factor."

In addition to presenting evidence contradicting Standard's claim that individuals diagnosed with adjustment disorders are more likely to become disabled, Goldman also raised questions of fact as to whether Standard could profitably offer disability income insurance to Goldman. Dr. Sachs stated that Goldman did not present greater-than-average risk of becoming disabled. DeWeese disputed the more general proposition that "an insurance company jeopardizes the financial viability of the insurance by underwriting this risk [of mental disorder claims]." DeWeese pointed out that Standard's conclusion was based on the duration of psychiatric claims, a factor which is relevant only when considered in conjunction with the number of claims. Moreover, DeWeese posited that Standard would not have to "increase prices dramatically" if it investigated and considered applicants with current or past treatment for a nondisabling psychiatric condition.

Who is correct in this battle of experts is not for us to decide. We do conclude, however, that Goldman's expert evidence is sufficient to deny Standard summary judgment on its section 10144 defense.

## III.

### Goldman's Section 17200 claim

 California's unfair competition law, Business & Professions Code section 17200 *et seq.,* prohibits "any unlawful, unfair or fraudulent business act or practice.... By proscribing any unlawful business practice, § 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 180, 83 Cal. Rptr.2d 548, 973 P.2d 527 (1999) (quotations and citations omitted). Because summary judgment is not warranted on Goldman's Unruh Act claim, her claim under section 17200 also survives.

Goldman urges that we hold Standard liable under section 17200 even if we conclude Standard has not violated the Unruh Act. Goldman relies on the principle that "a practice may be deemed unfair even if not specifically proscribed by some other law.... In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." *Id.* at 180, 83 Cal.Rptr.2d 548, 973 P.2d 527. But there is a "safe harbor" exception to this principle that precludes Goldman's attempt to isolate her section 17200 claim. *Id.* at 165–66, 83 Cal.Rptr.2d 548, 973 P.2d 527.

 Under California law, if the Legislature has provided a safe harbor for certain conduct, that conduct will not create liability under section 17200. But "[t]o forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct." *Id.* at 183, 83 Cal.Rptr.2d 548, 973 P.2d 527. We view California Insurance Code section 10144 as meeting this standard. As we have seen, it specifically permits an insurance company to refuse coverage on the basis of a mental impairment, as long as that denial was "based on sound actuarial principles or [was] related to actual and reasonably anticipated experience." Section 10144 provides a safe harbor for such denials of insurance coverage, thereby defeating a section 17200 claim based upon "unfair business practices." Thus, Goldman's section 17200 claim is dependant upon her prevailing on her Unruh Act claim and overcoming Standard's reasonableness defense under section 10144.

### Conclusion

We hold that, unlike the ADA as interpreted by the United States Supreme Court in *Sutton v. United Air Lines,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the 1997 version of the Unruh Act did not require a presently limiting disability. The 2000 Poppink Act merely clarified that this was the existing state of California law. Goldman satisfies the Unruh Act definition of disability that was effective in 1997, because Standard regarded her as having a mental disorder that has no presently disabling effect but may have that effect in the future. Further, Goldman has sufficiently disputed Standard's claim that its decision was based on sound actuarial principles or related to actual and reasonably anticipated experience. Cal. Ins.Code § 10144. Therefore, the district court's grant of summary judgment on Goldman's Unruh Act claim is reversed as is the court's grant of summary judgment on Goldman's unfair competition claim.

**REVERSED AND REMANDED.**